994 A.2d 896

Anthony ALSTON

v.

STATE of Maryland.

No. 129, Sept. Term, 2007.

Court of Appeals of Maryland.

May 11, 2010.

94

David P. Kennedy, Asst. Public Defender (Nancy S. Forster, Public Defender, Baltimore), on brief, for petitioner/cross-respondent.

Jeremy M. McCoy, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore), on brief, for respondent/cross-petitioner.

Argued before HARRELL, BATTAGLIA, GREENE, JOHN C. ELDRIDGE (Retired, Specially Assigned), IRMA S. RAKER (Retired, Specially Assigned), LAWRENCE F. RODOWSKY (Retired, Specially Assigned), and ALAN M. WILNER (Retired, Specially Assigned), JJ.

JOHN C. ELDRIDGE, J., (Retired, Specially Assigned).

This Court in *Harris v. State,* 406 Md. 115, 129–132, 956 A.2d 204, 212–214 (2008), held that where a criminal defendant was convicted by a jury which had never been sworn, the failure to swear the jury was a "structural error" requiring the reversal of the conviction and the award of a new trial. Because the error was "structural," it could not be cured by anything occurring at the original trial, and principles of

waiver and harmless error were inapplicable. With regard to the situation "where the jury was sworn, but where the administration of the oath to jurors did not occur before all or a substantial part of the evidence had been introduced," the Court in *Harris* stated: "we leave for another day the resolution of any issues arising when there is a belated administration of the oath to jurors." *Harris*, 406 Md. at 128–129, 956 A.2d at 212. "Another day" has arrived, as the case at bar involves the belated swearing of the jury. This case also presents an issue of whether the defendant-petitioner was lawfully convicted of and sentenced for conspiracy to commit first degree murder.

## I.

Petitioner Anthony Alston was charged with first degree murder, second degree murder, conspiracy to murder, use of a handgun in the commission of a felony or crime of violence, and wearing, carrying or transporting a handgun. Alston was tried before a jury in the Circuit Court for Baltimore City on June 10, 11, 14, and 15, 2004. The jury returned a verdict of guilty on the charge of conspiracy to murder and acquitted Alston on the remaining charges. Alston was sentenced to life in prison for conspiracy to commit murder. The Court of Special Appeals affirmed the judgment, and this Court granted Alston's petition for a writ of certiorari. *Alston v. State,* 177 Md.App. 1, 934 A.2d 949 (2007), *cert. granted,* 403 Md. 304, 941 A.2d 1104 (2008).

Testimony elicited at trial described the incidents that led to the death of the victim, Johnny Cabizza.[1] Shervan Easton, an alleged accomplice and co-conspirator, who was granted immunity in exchange for his testimony, testified at Alston's trial that he had met Alston at around noon on July 10, 2003, along with another individual named "El," at the main office of their

---

1. Throughout the record in this case, the victim's last name is sometimes spelled "Cabeza" and sometimes spelled "Cabizza." We shall in this opinion use "Cabizza" which is the spelling used in the briefs.

employer in Capitol Heights, Maryland.[2] Easton stated that the three men chatted briefly and then decided to drive to Baltimore to "get some blow, some heroin." Easton drove a blue Ford van and Alston and El followed him in a red Kia automobile. Once in Baltimore, they located a group of four or five teenagers sitting on a stoop at the corner of Edmondson Avenue and an alley. They asked the group if there "was anything out, and they said, yes, you know, just walk around the corner." Easton and Alston proceeded around the corner while El stayed behind. Easton testified that, as he and Alston walked down the alley, "a little guy . . . pulled a pump shotgun from under a cardboard box and stuck it in my face and told me, that's right, throw all the money down and take the phone off your hip too." Easton also indicated that, at the time of this encounter, Alston was "like 10 feet behind me."

After the robbery, Easton testified that he and Alston "backed off" slowly, and then the three men returned to their vehicles. As they drove away, Easton spotted one of the teenagers who had directed them down the alley, riding a bicycle. Easton tried to turn his vehicle around to chase the teenager, but instead the vehicle struck a tree. Alston, Easton, and El continued to drive around the neighborhood searching for the person who had robbed them, but they eventually gave up and drove to a different part of Baltimore where they purchased heroin. They then returned to Easton's house in Anne Arundel County. According to Easton's testimony, once back at his house, Alston began to taunt Easton, saying, "hey, boy, you want your stuff back." When Easton responded that he "would like to have [his] stuff back," Alston asked for Easton's gun, a .380 Taurus pistol, and the three men returned to Baltimore in Alston's vehicle. Easton testified that, once they arrived in the neighborhood where the robbery occurred, Easton remained in the parked car while

---

2. The record does not provide any additional identifying information regarding "El." Easton testified that July 10, 2003, was the "first time I ever saw him," and no one else testifying had met or spoken with El. Apparently the authorities have not been able to locate El.

Alston and El walked through the alley searching for the individual who had earlier robbed Easton. After 15 to 20 minutes, Easton heard two or three gunshots, followed by Alston and El returning to the car at a "fast jog."

When the police responded to a call for a shooting at about 5 p.m. on July 10, 2003, in the 1800 block of Edmondson Avenue, they found Johnny Cabizza lying on the sidewalk bleeding from multiple gunshot wounds. Cabizza was taken to a hospital where he was pronounced dead. A firearms examiner of the Baltimore City Police Department testified that the bullets removed from Cabizza's body, as well as the cartridges recovered from the scene, came from a .380 pistol, and that all of the cartridges recovered had come from one gun, likely a Taurus or Beretta semiautomatic pistol.

After discovering Easton's cell phone on the body of the victim, the police located Easton at his home on July 11, 2003, at approximately 3 a.m., and brought him to the police station for questioning. During the course of the investigation, Easton was granted immunity in return for his cooperation and agreement to testify for the State. In addition to Easton's testimony, three of the teenagers who had initially directed Easton and Alston to the alley testified on behalf of the State. In some respects their testimony corroborated Easton's testimony, and in other respects it differed somewhat.

All of the State's evidence, except for a stipulation concerning gun shot residue, had been introduced by the end of the third day of trial. At the beginning of the fourth day of trial, defense counsel represented to the trial judge that, during the prior evening, defense counsel realized that the jury had never been sworn. Following conversations between the trial judge and counsel for each side, which were apparently not recorded, the case was called and the judge stated:

"THE COURT: [I]t appears that no one swore the jury. Now, I've spoken to counsel about this at length. Counsel has had a chance to talk to their client. What I proposed to do is, swear them now, question them as to whether or not they've in any way done anything or experienced anything

that would violate their oath and whether they're able to fulfill their oath.

"The Defendant wishes, I know, to make a motion for mistrial, but a rapid review of the case law indicates there is no case law. So what I would rather do rather than try to do this in a helter-skelter way while the jury's standing up there in the room is instruct the jury, close the case, wrap it up and you can refil[e] on the same grounds in a motion for a new trial. At that time, we'll have the time to look up the law in other states and see if there's any federal cases that apply to this jurisdiction, if there's any other law that clarifies this point, rather than try to do this all of the sudden and throw away perhaps unnecessarily, perhaps necessarily, the efforts of the jury over the last two days and everybody else involved in this case. So you want to make a motion for a mistrial?

"MS. DAVIS [DEFENDANT'S ATTORNEY]: Your Honor, based on the fact the jury was not sworn, I would make a motion for mistrial. I would note for the record that it came to my attention when I was, you know, over-overnight. I asked the Court Clerk. It was reflected in the court file, the jury had been sworn; however, based on our further investigation it appears as though the jury was not sworn. So on behalf of Mr. Alston, I would make a motion for mistrial.

"THE COURT: The motion is denied with leave to basically raise the same grounds in a motion for new trial depending on how the case comes out. Are we all clear on this?"

The oath was then administered to the jury. Next, the trial judge addressed the jury as follows:

"Now, what I'm going to ask you individually, and I'll ask each of you in turn, is whether anything has occurred during the course of this trial or whether now, having been sworn in, you're aware of anything that in any way would interfere with your fulfilling this oath and treating this oath as though it were administered at the beginning of this case.

In other words, it's as though you were sworn in at the beginning of this case, you heard the oath, you swore to the oath, you're now under oath. Is there anything that would interfere with or anything that has occurred or would affect your ability to deliberate and decide this case in accordance with the oath you've just been given, in accordance with the evidence in this case, in accordance with the law of the State of Maryland?"

The trial judge proceeded to inquire of each juror individually, "Is there anything?" Each juror responded "No," with the exception of two jurors whose responses were inaudible to the transcriber, but which we shall assume were also "No." [3] After questioning the jurors, the judge stated:

"Okay. I'm going to find that you have been duly sworn, that there has been no violation of the oath and that from as best as I can gather from the answers to your questions and the questions I have asked, you are able and have fulfilled that oath up to this point and will presumably fulfill that oath through the conclusion of this case."

As previously indicated, the State then filed a brief stipulation regarding gunshot residue and rested. The defendant moved for a judgment of acquittal, which was denied, and then rested without presenting any evidence. The trial judge gave detailed instructions to the jury concerning each of the offenses charged, and counsel then made closing arguments. With respect to the count charging conspiracy to murder, the trial judge instructed the jury as follows:

"The Defendant is charged with the crime of conspiracy to commit murder. Conspiracy is an agreement between two or more person[s] to commit a crime. In order to convict the Defendant of conspiracy, the State must prove, (1) that the Defendant entered into an agreement with at least one other person to commit the crime of murder and

---

3. We agree with the statement of the Court of Special Appeals that "we are satisfied that if any juror had answered the question in the affirmative, the court would have further investigated before proceeding." *Alston v. State*, 177 Md.App. 1, 11 n. 1, 934 A.2d 949, 955 n. 1 (2007).

that the Defendant entered into the agreement with the intent that that crime be committed."

Defense counsel made no objection to the instructions.

Following deliberations, the jury returned verdicts of not guilty on the first and second degree murder charges and on the two handgun charges. The jury, however, did find Alston guilty of conspiracy to murder. Specifically, the judge asked the jury:

"THE COURT: [D]o you find that the Defendant, Anthony Alston, did conspire with certain other persons to murder Johnny Cabizza, not guilty or guilty?

"JURY FOREPERSON: Guilty."

The jury was polled and the clerk announced to the jury that "[y]ou have found the Defendant guilty of conspiring with others to murder Johnny Cabizza." The jurors all agreed. The trial judge thanked the jurors for their service and then dismissed the jury.

Following a discussion with counsel concerning a presentence investigation and a date for sentencing, the trial judge posed a question to the attorneys for each side:

"THE COURT: Let me ask you all a question. I know we've had so many strange issues come up in this case. Tell me, I'm sure you probably are all correct that it doesn't matter, but the Verdict Sheet as to Count I does not—'did conspire with certain other persons to murder Johnny Cabizza.' No degree is mentioned.

"MS. AYRES [PROSECUTING ATTORNEY]: Your Honor, murder in the first degree.

"THE COURT: It's not what it says on the Verdict Sheet.

"MS. AYRES: On the copy I have it says that.

"THE COURT: Where did this come from?

"CLERK: That's—

"MS. DAVIS [DEFENDANT'S ATTORNEY]: And that's on the copy I have just says murder. It doesn't specify whether it was first.

"THE COURT: Where's the Verdict Sheet they signed? It just says 'Murder.' What does that mean? Where did this Verdict Sheet come from?

"CLERK: (Inaudible).

"THE COURT: From the indictments. So the indictment does say murder in the first degree, murder in the second degree?

"MS. AYRES: No. I think it's conspiracy to murder.[4]

"THE COURT: All right. Well, this—well, anyhow, you deal with that. All right. You've got ten days.

"MS. DAVIS: Yes.

"THE COURT: And it might be there's a presumption, therefore, it's murder in the second degree, but I don't know what it means. All right. Anything else?"

Thus, it was the trial judge who initially saw and raised the issue concerning the charge of conspiracy to murder. He instructed counsel to "deal with" it in the motion for a new trial which was due in 10 days.

At oral argument on the motion for a new trial, defense counsel renewed her objection to the belated swearing of the jury. The trial judge rejected the argument, stating:

"THE COURT: I mean I thought about the issue, and my reaction is that it probably is quite harmless. I can't figure out why it would make any difference.

"In other words, I swore them as best I could eventually in a retroactive way. As I recall, I asked them, 'Any issues with respect to being sworn now? Anything that you would have done previously that would have violated the oath?' And I did the best I could. And I think, frankly, it is quite harmless and irrelevant. So I'll deny the motion [on] that ground."

---

**4.** The indictment in pertinent part charged that the defendant "unlawfully did CONSPIRE with ... certain other persons ... to murder one Johnny Cabeza in violation of the Common Law...." The conspiracy indictment did not contain the words "first degree" or "second degree," or any other language categorizing or describing the alleged conspiracy to murder.

Alston's attorney also addressed, *inter alia,* the conspiracy charge, arguing that a new trial was warranted

"based upon the fact that the State charged my client with conspiracy to commit murder. There's no language in the indictment, nor was there any language in the jury instruction-I watched the videotape. The Court instructed the jury that conspiracy to commit murder was an agreement between two persons to commit murder. It was not specific as to whether or not he was charged with conspiracy to commit first or second degree murder."

The defendant's attorney continued:

"[T]he Court [of Appeals] has left open the possibility that there is such a crime as conspiracy to commit murder [in the second degree]. Because that delineation was not made on the indictment, it was not made during jury instructions, it was not argued before the jury, I believe that the Court should allow my client to have a new trial based on that issue.

"It makes a huge difference. My client could be facing life imprisonment, or he could be facing a maximum penalty of 30 years."

The trial judge responded by pointing out that "nobody asked me to give an instruction on conspiracy to commit second degree murder." The judge continued: "[I]f you thought there was such a thing as conspiracy to commit second degree murder, why didn't you ask for an instruction?" Defense counsel answered that, "at that time, my issue was that it shouldn't have been sent to the jury at all." The judge alternatively ruled as follows: "[B]y the very definition of what a conspiracy is, how can it ever be second degree murder? In other words, you can't have conspiracy if you didn't plan, think, devise, and so forth."

The court denied the motion for a new trial and sentenced Alston to life in prison for conspiracy to murder. Alston appealed and, as previously mentioned, the Court of Special Appeals, affirmed. With regard to the belated administration of the jury oath, the Court of Special Appeals held "that the

belated swearing of the jury was harmless error." *Alston v. State, supra,* 177 Md.App. at 30, 934 A.2d at 966. As to Alston's contention that he should not have been convicted of conspiracy to commit first degree murder, the intermediate appellate court held that "Alston's failure to challenge the jury instruction [relating to conspiracy to murder] . . . now bars his asserted assignment of error." *Alston,* 177 Md.App. at 40, 934 A.2d at 972.

Alston filed a petition for a writ of certiorari which this Court granted. *Alston v. State, supra,* 403 Md. 304, 941 A.2d 1104. The petition presented the following two questions:

"1. Did the trial court err in denying Alston's motions for a mistrial and for a new trial where the jury was not sworn until after the essential conclusion of the State's case?

"2. Did the trial court err in sentencing Alston to life for conspiracy to murder where under the instructions given the jury could have found Alston was guilty only of conspiracy to commit second degree murder?"

The State filed and this Court granted a conditional cross-petition for a writ of certiorari, raising the question of whether Alston waived his challenge to the belated swearing of the jury by not raising the issue at an earlier point in the trial. Since we shall answer the first question in Alston's certiorari petition in the negative, we shall not reach the issue presented in the State's cross-petition.

## II.

### A.

In *Harris v. State, supra,* 406 Md. at 129, 956 A.2d at 212, this Court held "that principles of waiver and harmless error are inapplicable when a jury in a criminal case has never been sworn." We held that "a jury which has never been sworn falls into the same 'structural error' category as a defective reasonable doubt instruction, the denial of a right to a jury trial, the total deprivation of counsel," etc., and that, therefore, "the complete failure to swear the jury can never be harmless error." *Harris,* 406 Md. at 130, 956 A.2d at 213.

In reaching these conclusions in *Harris,* this Court pointed out that Article 5 of the Maryland Declaration of Rights grants to litigants the right to a common law jury, and, to be "legally constituted," a common law jury must be sworn, *Harris,* 406 Md. at 124–129, 956 A.2d at 209–213. See also Maryland Rule 4–312(f) (referring to jurors impanelled to hear the case as "sworn jurors"). The *Harris* opinion also relied on numerous cases which "have held that a sworn jury is an element of an 'impartial' jury," guaranteed by Article 21 of the Maryland Declaration of Rights. *Harris,* 406 Md. at 125–129, 956 A.2d at 209–213. Moreover, in *Harris* we reviewed an almost unanimous line of cases in other jurisdictions holding that the harmless error principle has no application when a defendant is convicted by a jury which was never sworn. Finally, we noted in *Harris,* 406 Md. at 131–132, 956 A.2d at 213–214, that, under double jeopardy principles, jeopardy attaches in a criminal jury trial when the jury is sworn. If the jury is never sworn, the accused arguably has never been placed in jeopardy and, therefore, runs the risk of being prosecuted a second time for the same offense.

Turning to the present case, the belated administration of the oath to the jurors clearly violated Maryland Rule 4–312(f). Consequently, it constituted error. The pertinent issues are whether the harmless error doctrine is applicable and, if applicable, whether the error was harmless.

Unlike *Harris,* the present case does not involve a jury which was never sworn. The jury in this case was administered the oath near the end of the prosecution's introduction of evidence, and the trial judge instructed the jury that it should treat the oath as if "it were administered at the beginning of the case." This difference between the instant case and *Harris* is most significant. The reasons set forth in *Harris,* for holding inapplicable the harmless error doctrine, are absent here. The jury in this case, having been sworn, was a "legally constituted" common law jury. It did not lack impartiality because of the absence of an oath. Because the oath was administered, even though belatedly, jeopardy at-

tached. Any attempt to prosecute Alston again for the same offenses charged in this case would be prohibited by double jeopardy principles.

As noted in *Harris,* 406 Md. at 126–129, 956 A.2d at 210–212, cases in other jurisdictions are in conflict with regard to the applicability of the harmless error principle when a jury is belatedly sworn. Nevertheless, a substantial majority of the cases have held that, as long as the oath is administered before the jury begins deliberations, the harmless error doctrine is applicable. *See, e.g., State v. Godfrey,* 136 Ariz. 471, 472, 666 P.2d 1080, 1081 (1983) (After reviewing cases from several states, the court concluded: "These cases exemplify the apparent majority view that a failure to swear the jury until the case has commenced is generally harmless error . . . where there is no actual prejudice shown and the oath is administered prior to deliberations"); *People v. Clouse,* 859 P.2d 228, 233 (Colo.App.1992) ("[W]e conclude that the failure to swear in the jury at this stage of the trial constituted harmless error. . . . The record confirms that the jury was sworn in long before deliberations, and the trial court informed the jury that the oath applied retroactively"); *Adams v. State,* 286 Ga. 496, 498, 690 S.E.2d 171 (2010) ("[I]n the absence of a showing of actual prejudice . . ., there is no reversible error if a belated oath is given prior to the jury's deliberations"); *People v. Abadia,* 328 Ill.App.3d 669, 677, 262 Ill.Dec. 881, 767 N.E.2d 341, 349 (2001), *leave to appeal denied,* 201 Ill.2d 575, 271 Ill.Dec. 929, 786 N.E.2d 187 (2002) ("[F]ailing to administer the juror's oath until after the close of the government's case but before deliberation was harmless error," citing *United States v. Hopkins,* 458 F.2d 1353, 1354 (5th Cir.1972)); *State v. Apodaca,* 105 N.M. 650, 654, 735 P.2d 1156, 1160 (1987) ("Although a jury's oath is not a mere formality, . . . where the jury is sworn during trial, but prior to commencement [of] deliberations upon the verdict, the error does not warrant reversal in the absence of prejudice"); *People v. Morales,* 168 A.D.2d 85, 89, 570 N.Y.S.2d 831, 833 (1991) ("[T]he jury was sworn prior to deliberations," and "the delay in swearing the jury constituted harmless error"); *State*

*v. Roberge,* 155 Vt. 121, 122–123, 582 A.2d 142, 143 (1990) ("[A]bsent . . . a showing of prejudice by the delay in swearing, there is no reversible error where a jury is sworn before deliberations in a criminal case"); *State v. Block,* 170 Wis.2d 676, 682, 489 N.W.2d 715, 717–718 (1992) (The jury was not sworn until six prosecution witnesses had testified, and the court held: "Although the trial court here could have in the reasoned exercise of its discretion granted defendant's mistrial motion," nonetheless "[a]bsent prejudice, reversal is not warranted"). *See also, e.g., Cooper v. Campbell, Superintendent, Arkansas Department of Correction,* 597 F.2d 628, 629 (8th Cir.1979), *cert. denied,* 444 U.S. 852, 100 S.Ct. 106, 62 L.Ed.2d 69 (1979); *State v. Gallow,* 452 So.2d 1288, 1290 (La.App.1984); *State v. Saybolt,* 461 N.W.2d 729, 736–737 (Minn.App.1990); *Lester v. State,* 767 So.2d 219, 223 (Miss.App.2000); *State v. Barone,* 329 Or. 210, 227, 986 P.2d 5, 17–18 (1999).

■■■ We agree with the majority view that draws a distinction between (1) a jury which is never sworn or not sworn prior to deliberations, and (2) a jury that is belatedly sworn, but the oath is administered before the commencement of jury deliberations. As previously discussed, the reasons for treating the former as structural error do not apply to the latter. Accordingly, in the latter situation, the error is subject to a harmless error analysis. Where the defendant is not prejudiced by the delay, the late administration of the oath will ordinarily cure the error.

### B.

■■ The Maryland standard for determining whether error in a criminal case is harmless was set forth in the leading case of *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976), as follows:

"We conclude that when an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influ-

enced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated."

This standard has been reiterated by the Court countless times. For recent cases, *see, e.g., Lancaster v. State,* 410 Md. 352, 369, 978 A.2d 717, 727 (2009); *State v. Blackwell,* 408 Md. 677, 698, 971 A.2d 296, 308 (2009); *Parker v. State,* 408 Md. 428, 446, 970 A.2d 320, 331 (2009); *Johnson v. State,* 408 Md. 204, 229, 969 A.2d 262, 276 (2009); *Tucker v. State,* 407 Md. 368, 382–383, 965 A.2d 900, 908–909 (2009); *Taylor v. State,* 407 Md. 137, 164–165, 963 A.2d 197, 213 (2009); *Hutchinson v. State,* 406 Md. 219, 227, 958 A.2d 284, 288 (2008), and cases there cited.

In the present case we are satisfied, beyond a reasonable doubt, that the tardiness in the administration of the oath to the jury did not affect the verdicts. Consequently, the belated swearing of the jury did not prejudice Alston.

■ After the jurors were sworn, the trial judge carefully instructed the jurors that they should treat the oath "as though it were administered at the beginning of the case," and that "it's as though you were sworn in at the beginning of the case...." The judge asked the jury if there was anything, or if there were any occurrences, that "would affect your ability to deliberate and decide this case in accordance with the oath you've just been given, in accordance with the evidence in this case, [and] in accordance with the law...." After giving these instructions and posing these questions to the jury as a whole, the trial judge asked the same questions of each juror individually and received negative answers. As this Court has often recognized, "our legal system necessarily proceeds upon the assumption that jurors will follow the trial judge's instructions." *State v. Moulden,* 292 Md. 666, 678, 441 A.2d 699, 705 (1982). *See, e.g., Spain v. State,* 386 Md. 145, 160, 872 A.2d 25, 34 (2005); *Poole v. State,* 295 Md. 167, 175, 453 A.2d 1218, 1223 (1983); *Washington v. State,* 293 Md. 465, 471, 445 A.2d 684, 687 (1982); *Blanchfield v. Dennis,* 292 Md. 319, 325, 438 A.2d 1330, 1334 (1982); *Wilson v. State,* 261 Md. 551, 570, 276 A.2d 214, 223 (1971).

Moreover, there is in this record no indication of any improper conversations or activities by jurors during the period prior to the administration of the oath. *See State v. Gallow, supra,* 452 So.2d at 1290 (referring to the absence of "some activity which was incompatible with a juror's duties" or "impermissible conversation . . . between the jurors" occurring prior to the jurors being sworn). In addition, the jury's verdicts of acquittal on the murder and handgun charges indicate that the jurors conscientiously and impartially considered each count and that they were not prejudiced against the defendant.

The failure to administer the oath to the jurors at the beginning of the trial, under the particular circumstances here, was harmless error.

### III.

The second issue raised in the certiorari petition is the defendant's contention that he was improperly convicted and sentenced for conspiracy to commit first degree murder. As previously mentioned, defense counsel at the hearing on the motion for a new trial argued, for the first time, that the "conspiracy to commit murder" jury instruction was deficient because "[i]t was not specific as to whether or not he [the defendant] was charged with conspiracy to commit first or second degree murder." The trial judge rejected this argument on alternative grounds. First, the trial judge pointed out that defense counsel had not requested a different jury instruction or objected to the instruction which was given. Second, the trial judge alternatively held that conspiracy to commit murder, by its very nature, is conspiracy to commit first degree murder, and that there is no such offense in Maryland as conspiracy to commit second degree murder.[5]

---

5. In Maryland there are four types of second degree murder: (1) killing a person with intent to kill but without deliberation and premeditation; (2) killing a person without the intent to kill but with the intent to inflict such grievous bodily harm that death would be a likely result; (3) depraved heart murder; (4) felony murder, where the killing is commit-

Under the circumstances of this case, both grounds relied on by the trial judge in declining to grant the defendant's motion for a new trial are sound.

### A.

■ As to the trial judge's first ground, the defendant in this Court maintains that he is not challenging the jury instructions. Nevertheless, his argument is directly aimed at the jury instructions. Thus, the defendant concludes his argument as follows (defendant's brief in this Court at 33, emphasis supplied):

> "But this is not a challenge to the jury instructions. They were not wrong on their face; *they simply lacked the precision necessary* to guarantee an unambiguous verdict on the charge of conspiracy to murder."

At another place the defendant argues (*id.* at 32–33, some emphasis supplied and some in original):

> "The problem here is that, *based on the instructions given,* which in and of themselves were not incorrect, the jury could have found Alston guilty of conspiracy to *murder,* as they did, based on a belief that he had conspired to commit only *second-degree* murder.

> "The jury *was never instructed* that there was no such crime [as conspiracy to commit second degree murder], nor were they told that they had to specifically find that Alston conspired to commit first-degree murder."

Despite the defendant's disclaimer that the jury instructions are not at issue, it is obvious that the defendant's complaint entirely revolves around the contention that the jury was not properly instructed on the conspiracy charge.

As pointed out by the trial judge at the hearing on the motion for a new trial, the defendant's complaint regarding

---

ted in the perpetration of certain felonies. *See Thornton v. State,* 397 Md. 704, 721–725, 919 A.2d 678, 687–690 (2007); *Fisher v. State,* 367 Md. 218, 786 A.2d 706 (2001); *Alston v. State,* 339 Md. 306, 662 A.2d 247 (1995).

the jury instructions was not made until that post-trial hearing. Thus, we agree with the Court of Special Appeals that the defendant's objection to the jury instructions was waived.

Maryland Rule 4–325(b) and (e) provides as follows:

"(b) **Written requests.** The parties may file written requests for instructions at or before the close of the evidence and shall do so at any time fixed by the court.

\* \* \*

"(e) **Objection.** No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury. An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object."

In the instant case, the defendant made no requests for instructions on conspiracy, and, as discussed above, he did not object to the instructions as given. As set forth in Maryland Rule 4–325(e), he may not "assign as error the giving or the failure to give" particular instructions on conspiracy to murder.

■ Countless opinions of this Court have held that, when no timely objection to the jury instructions is made in the trial court, this Court ordinarily will not review a claim of error based on those instructions. The principle was set forth in *State v. Rose,* 345 Md. 238, 245–246, 691 A.2d 1314, 1317–1318 (1997), as follows (footnote omitted):

"The general rule is that the failure to object to a jury instruction at trial results in a waiver of any defects in the instruction, and normally precludes further review of any claim of error relating to the instruction. *See* Maryland Rule 4–325(e). *See also Walker v. State, supra,* 343 Md. [629] at 645, 684 A.2d [429] at 429 [ (1996) ] ("the failure to

object to a jury instruction ordinarily constitutes a waiver of any later claim that the instruction was erroneous"), and the cases there cited."

A principal purpose of Rule 4–325(e) "is to give the trial court an opportunity to correct an inadequate instruction" before the jury begins deliberations. *Bowman v. State,* 337 Md. 65, 69, 650 A.2d 954, 956 (1994). *See also* the discussion in *Johnson v. State,* 310 Md. 681, 686–689, 531 A.2d 675, 677–679 (1987).

In sum, the defendant's argument, that his conviction and life imprisonment sentence for conspiracy to murder were erroneous, is based upon the trial judge's jury instructions. Since the defendant neither requested any jury instructions relating to the conspiracy count nor objected to the jury instructions given, the argument was waived.

### B.

██ Alternatively, even if we exercise our discretion under Maryland Rules 4–325(e) and 8–131(a) and excuse the defendant's failure to object to the instructions, the result would not be different.

██ The defendant contends that, if properly instructed, "the jury could have found that Alston conspired to commit second degree murder" of the type based on an intent to inflict bodily harm (defendant's brief in this Court at 30). The defendant thus states that *(id.* at 31, emphasis supplied)

"the jury could very well have found that Alston *conspired to commit grievous bodily harm* of a kind that a reasonable person should know would be likely to result in death, *Thornton v. State,* 397 Md. 704, 713, 919 A.2d 678, 683 (2007), thus conspiring to commit second degree murder of that variety."

An analysis of the offenses, however, shows that the defendant's argument is inconsistent with Maryland law relating to conspiracy and second degree murder. Under Maryland law, there can be no such thing as a conspiracy to commit second

degree murder of the intent-to-inflict-grievous-bodily-harm variety.

This Court in *Mitchell v. State*, 363 Md. 130, 767 A.2d 844 (2001), after reviewing Maryland law concerning conspiracy and second degree murder, held that there was no such crime in Maryland as conspiracy to commit second degree murder based upon an intent to kill but without deliberation and premeditation. The Court did not decide whether there could be a conspiracy to commit other types of second degree murder. With regard to the type of second degree murder involved in *Mitchell*, Judge Wilner for the Court analyzed the elements of conspiracy and second degree intent-to-kill murder and concluded *(Mitchell*, 363 Md. at 149, 767 A.2d at 854):

"[T]he kind of awareness and reflection necessary to achieve the unity of purpose and design for a conspiracy is essentially the same as that required for deliberation and premeditation. We think that . . . where the charge is made and the evidence shows that the defendant conspired to kill another person unlawfully and with malice aforethought, the conspiracy is necessarily one to commit murder in the first degree (even if a murder pursuant to the conspiracy never occurs or, for whatever reason, amounts to a second degree murder), as the agreement itself, for purposes of the conspiracy, would supply the necessary deliberation and premeditation."

An examination of conspiracy and second degree murder of the intent-to-inflict-grievous-bodily-harm variety leads to a result similar to the one reached in *Mitchell*.

In *State v. Johnson*, 367 Md. 418, 424, 788 A.2d 628, 632 (2002), Judge Battaglia for the Court summarized the nature of conspiracy as follows:

"This Court consistently has defined conspiracy as the agreement between two or more people to achieve some unlawful purpose or to employ unlawful means in achieving a lawful purpose. *See McMillian v. State*, 325 Md. 272, 290–91, 600 A.2d 430, 439 (1992) (quoting *Monoker v. State*, 321 Md. 214, 221, 582 A.2d 525, 528 (1990)); *Apostoledes v.*

*State,* 323 Md. 456, 461–62, 593 A.2d 1117, 1120 (1991) (quoting *Townes v. State,* 314 Md. 71, 75, 548 A.2d 832, 834 (1988)); *Mason v. State,* 302 Md. 434, 444, 488 A.2d 955, 960 (1985). We have further explained that,

> 'The essence of a criminal conspiracy is an unlawful agreement. The agreement need not be formal or spoken, provided there is a meeting of the minds reflecting a unity of purpose and design. In Maryland, the crime is complete when the unlawful agreement is reached, and no overt act in furtherance of the agreement need be shown.'
> *Townes,* 314 Md. at 75, 548 A.2d at 834. At the core of the crime of conspiracy is the agreement; thus, conspiracy requires two or more participants. *See Mason,* 302 Md. at 444, 488 A.2d at 960 (stating that '[t]he agreement is the crime, and the crime is complete without any overt act'); *Gardner v. State,* 286 Md. [520] at 524, 408 A.2d [1317] at 1319 [ (1979) ] (noting that 'conspiracy necessarily requires the participation of at least two people')."

*See also Monoker v. State,* 321 Md. 214, 221, 582 A.2d 525, 528 (1990) ("The gist of conspiracy is the unlawful agreement. . . . The crime is complete when the unlawful agreement is made").

██ Not only is the offense of conspiracy complete when the unlawful agreement is reached, but a conspiracy to commit a crime is entirely separate from the substantive crime. As this Court explained in *Grandison v. State,* 305 Md. 685, 759, 506 A.2d 580, 617 (1986), regarding conspiracy to murder,

> "once the agreement to murder has been made, the crime is complete without any further action. * * * Conspiracy to murder requires an agreement, while murder, regardless of whether one is convicted as an accessory or a principal, requires the completed crime. Thus it is apparent that the conspiracy to murder is a separate and distinct crime from the substantive crime itself."

██ Another significant characteristic of conspiracy to commit a crime is that the defendant, to be found guilty of conspiracy, must have a specific intent to commit the offense

which is the object of the conspiracy. The Court in *Mitchell v. State, supra,* 363 Md. at 146, 767 A.2d at 853, explained as follows:

"As ... courts have consistently held, ... conspiracy is necessarily a specific intent crime; there must exist the specific intent to join with another person in the accomplishment of an unlawful purpose or a lawful purpose by unlawful means."

"When the object of the conspiracy is the commission of another crime, as in conspiracy to commit murder, the specific intent required for the conspiracy is not only the intent required for the agreement but also, pursuant to that agreement, the intent to assist in some way in causing that crime to be committed."

For other cases reviewing the nature of conspiracy under Maryland law, *see, e.g., Khalifa v. State,* 382 Md. 400, 436–437, 855 A.2d 1175, 1196 (2004); *In re Heather B.,* 369 Md. 257, 271, 799 A.2d 397, 405 (2002); *Johnson v. State,* 362 Md. 525, 528–533, 766 A.2d 93, 94–97 (2001); *Gary v. State,* 341 Md. 513, 517–518, 671 A.2d 495, 497 (1996); *Campbell v. State,* 325 Md. 488, 495–497, 601 A.2d 667, 670–671 (1992); *Apostoledes v. State,* 323 Md. 456, 461–466, 593 A.2d 1117, 1120–1122 (1991); *Townes v. State,* 314 Md. 71, 75, 548 A.2d 832, 834 (1988).

Turning to second degree murder of the intent-to-inflict-grievous-bodily-harm variety, Judge Greene for the Court in *Thornton v. State, supra,* 397 Md. 704, 919 A.2d 678, recently reviewed this offense. As emphasized throughout the *Thornton* opinion, what distinguishes this type of second degree murder from the other three types of second degree murder, as shown by its name, is the element of intent. The Court first "note[d] that the State must prove that the defendant acted with specific intent to inflict grievous bodily harm and malice." *Thornton,* 397 Md. at 714, 919 A.2d at 683. With regard to the nature of the intent to inflict grievous bodily harm, the *Thornton* opinion also pointed out (397 Md. at 730, 919 A.2d at 693): "The requisite intent for murder of the intent-to-inflict-bodily-harm modality is a narrow concept." The Court, distinguishing the intent to do grievous bodily

injury from the intent to kill, continued (397 Md. at 731–732, 919 A.2d at 694, emphasis in original):

"Murder of the intent-to-inflict-grievous-bodily-harm type is, by definition, a specific intent crime, even though there is no conscious or purposeful design to kill the victim. *Fisher*, 367 Md. at 274, 786 A.2d at 739. In *Glenn [v. State]*, 68 Md.App. [379] at 390, 511 A.2d [1110] at 1116 [ (1986) ], the intermediate appellate court acknowledged that '[t]he critical distinction that needs to be made ... is between *the results specifically intended*, not *between the presence or absence of a specific intent.* Although there is the purpose or design that the victim should die' [13] (citations omitted). * * * The difference between specific intent-to-kill murder and specific intent to commit grievous bodily harm is in the result specifically intended * * *."

13. Judge Wilner's analysis in *Jenkins v. State*, 59 Md.App. 612, 618, 477 A.2d 791, 794 (1984), *reversed in part, State v. Jenkins*, 307 Md. 501, 515 A.2d 465 (1986), is illustrative:

'An intent to maim, disfigure, or disable [virtually, if not completely, indistinguishable from the intent to do grievous bodily harm] necessarily falls short of, and thus excludes, an intent to kill. The actor's object in such a case is *not* to end the victim's life, but to have him linger on, either temporarily or permanently, in a disabled or disfigured condition. Conversely, although death is obviously the ultimate form of disablement, it is far more than that; one does not generally regard a killing as merely an extreme form of disablement.' "

At another point, the Court in *Thornton* emphasized (397 Md. at 713, 919 A.2d at 683, footnote omitted, emphasis supplied):

"We emphasize that where murder is predicated upon a theory of intent to commit grievous bodily harm, the intended harm must be grievous bodily harm and must be the legal equivalent of malice. Furthermore, in the context of a murder prosecution, intent to inflict grievous bodily harm means such harm that a reasonable person could or should know, under the circumstances, would likely result in death to the victim. *Because the crime involves an unintentional killing*, the defendant need not actually know that his conduct will result in the victim's death."

It is clear from *Thornton* that the intent-to-inflict-grievous-bodily-injury variety of second degree murder does

not involve an intent to kill. An intent to murder, however, means an intent to kill with malice. *State v. Earp*, 319 Md. 156, 163–164, 571 A.2d 1227, 1231 (1990); *State v. Jenkins*, 307 Md. 501, 514–515, 515 A.2d 465, 471–472 (1986). And a conspiracy to murder means a malicious intent to kill with deliberation and premeditation, *i.e.*, first degree murder, as the conspiracy necessarily supplies the elements of deliberation and premeditation. *Mitchell v. State, supra,* 363 Md. 130, 767 A.2d 844. Consequently, a charge of conspiracy to murder logically excludes second degree murder based upon an intent to inflict grievous bodily harm. The intent elements of each offense are entirely separate and distinct.

 Two cases cited above, *State v. Earp, supra,* 319 Md. 156, 571 A.2d 1227, and *State v. Jenkins, supra,* 307 Md. 501, 515 A.2d 465, while not involving charges of conspiracy to murder, are nevertheless very much in point regarding the elements of intent. In *State v. Earp,* the defendant was convicted in a nonjury trial of both attempted second degree murder based on a finding of intent to inflict serious bodily harm and assault with intent to maim. One issue in the case was, according to the Court (319 Md. at 162, 571 A.2d at 1231),

"whether an intent to do grievous bodily harm, which satisfies the *mens rea* element in a consummated murder, suffices for a conviction of attempted murder when death does not result."

As is the case with conspiracy to murder, "[t]he specific intent required to prove an attempt is the intent to commit a particular crime, in this case murder." *Earp,* 319 Md. at 163, 571 A.2d at 1231. The Court in *Earp* then held as follows (319 Md. at 164, 571 A.2d at 1230):

"The State, although agreeing that an intent to murder may consist of an intent to kill and the absence of justification, excuse, or mitigation, argues that an intent to commit grievous bodily harm will serve as a substitute for an intent to kill, as it does in the case of second degree murder. We do not agree. We hold, instead, that where an attempted murder is charged, the State must show a specific intent to

kill—an intent to commit grievous bodily harm will not suffice."

Similarly, with regard to conspiracy to murder, which also requires the same specific intent to kill, an intent to commit grievous bodily harm will not suffice.

A few years earlier than *Earp, State v. Jenkins, supra,* 307 Md. at 510, 515 A.2d at 469, had reached a similar conclusion with regard to assault with intent to murder, saying:

"Contrary to the State's premise, the critical element of assault with intent to murder, as the plain statutory language demonstrates, is an 'intent to murder.' The offense is not 'assault with intent to do grievous bodily harm,' which is how the State seems to view it."

Consequently, we reject the defendant Alston's argument that the jury, if properly instructed, could have found that Alston was guilty of a conspiracy to commit second degree murder of the type based on an intent to inflict grievous bodily harm. There is no such offense under Maryland law. Alston was charged with conspiracy to murder which requires a specific intent to kill.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY THE COSTS.*