*State of Maryland v. Latoya Jordan*, No. 23, September Term, 2021.  Opinion by Gould, J.

**HARMLESS ERROR – FAILURE TO ASK VOIR DIRE QUESTION – RIGHT NOT TO TESTIFY**

The harmless error doctrine applies to the failure to ask on voir dire questions related to the defendant's right not to testify.

**HARMLESS ERROR – FAILURE TO ASK VOIR DIRE QUESTION – RIGHT NOT TO TESTIFY**

The failure to ask on voir dire questions related to the defendant's right not to testify is a trial error, not a structural error.

**HARMLESS ERROR – FAILURE TO ASK VOIR DIRE QUESTION – RIGHT NOT TO TESTIFY**

The jury verdict in a case in which the trial court failed, during voir dire, to ask a question related to the defendant's right not to testify does not render the jury verdict inherently infirm from a constitutional standpoint.

**HARMLESS ERROR – FAILURE TO ASK VOIR DIRE QUESTION – RIGHT NOT TO TESTIFY**

Voir dire questions related to the defendant's right not to testify are tools for identifying individuals who should be struck for cause.  The possibility that an individual was empaneled who would have been stricken for cause does not render the trial fundamentally unfair.

Circuit Court for Baltimore City
Case No.: 819290001
Argued: December 6, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 23

September Term, 2021

_____

STATE OF MARYLAND

v.

LATOYA JORDAN

_____

\*Getty, C.J.,
\*McDonald,
Watts,
Hotten,
Booth,
Biran,
Gould,

JJ.

_____

Opinion by Gould, J.
Watts and Biran, JJ., dissent.

_____

Filed: August 15, 2022

\*Getty, C.J. and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court. After being recalled pursuant to Md. Const., Art. IV, § 3A, they also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In *Kazadi v. State*, this Court held that "on request, during *voir dire*, a trial court must ask whether any prospective jurors are unwilling or unable to comply with the jury instructions on the fundamental principles of presumption of innocence, the State's burden of proof, and the defendant's right not to testify." 467 Md. 1, 9 (2020). In Latoya Jordan's trial on two counts of second-degree assault, which took place before our decision in *Kazadi*, she requested a voir dire question on the third of those fundamental rights—a defendant's right not to testify. The trial court declined to ask the question. In the jury trial that followed, Ms. Jordan testified in her defense and was convicted on one of the assault counts and acquitted on the other.

Although *Kazadi* was decided after her trial, the parties agree that its holding applies to Ms. Jordan's case and that the trial court erred by refusing to ask Ms. Jordan's requested voir dire question.[1] The issue here is what to do about the error, which hinges on: (1) whether the harmless error doctrine applies to the specific error under *Kazadi* concerning the right not to testify, and (2) if so, whether the error in Ms. Jordan's case was harmless. The Court of Special Appeals assumed the former and answered "no" to the latter; therefore, it reversed Ms. Jordan's conviction and granted her a new trial.

---

[1] Although we will use the word "error" in this opinion, we recognize the unfairness of doing so because *Kazadi* was not decided until after Ms. Jordan's trial. Thus, we acknowledge that the trial judge did not actually err in applying this Court's precedent at the time Ms. Jordan's trial took place. *See Kazadi*, 467 Md. at 55-57 (McDonald, J., dissenting).

The State petitioned this Court for a writ of certiorari, *State v. Jordan*, 475 Md. 698 (2021), which we granted on the following question:

> Is it harmless error to fail to propound a voir dire question regarding a defendant's right to remain silent and not testify where the defendant actually testifies?

For the reasons explained below, we hold that the *Kazadi* error committed here was a trial error subject to the harmless error doctrine. We further hold that under the facts of this case, the error was harmless. Accordingly, we reverse the judgment of the Court of Special Appeals.

## BACKGROUND

The assault charges against Ms. Jordan arose out of an altercation during a program created by a nonprofit organization called Unique Fabrics, which teaches sewing skills to girls and women. The program was run by Mary Alexander. Ms. Alexander also supervised a "Youth Works" program through which she hired youths for summer jobs, including for Unique Fabrics. Ms. Jordan's 17-year-old niece, K.J.,[2] was one such student-employee in the 2019 summer session.

The Youth Works program is designed to teach young people the skills necessary to succeed in the workforce, including the appropriate use of a cell phone for personal use during working hours. When a student had difficulty complying with the cell phone policy, Ms. Alexander would enlist the involvement of the parent or guardian to facilitate an agreement with the student on cell phone usage. According to Ms. Alexander, the

_____

[2] Because she is a minor, we will refer to Ms. Jordan's niece by her first and last initials.

paperwork listed K.J.'s grandmother as her guardian. It was K.J.'s cell phone use that prompted an altercation between Ms. Alexander and Ms. Jordan on July 12, 2019, which resulted in the charges against Ms. Jordan. More details will be supplied below.

## *The Trial*

Ms. Jordan was charged with one count of second-degree assault against Ms. Alexander and a separate count of second-degree assault against Milroy Harried. At Ms. Jordan's trial, during voir dire, defense counsel requested that the court ask the following question (the "*Kazadi* question"):

> Every person accused of a crime has the absolute constitutional right to remain silent and not testify. If the defendant chooses not to testify the jury may not consider his/her silence in any way in determining whether he/she is guilty or not guilty. Is there any member of the jury who is unable or unwilling to uphold and abide by this rule of law?

The court declined the request. The court reasoned that the question would be "covered extensively in the [court's] instructions at the end," and by a separate voir dire question that "discusses . . . that the defendant is presumed innocent unless the State can prove him guilty beyond a reasonable doubt." The court also determined that, without knowing whether Ms. Jordan would testify, the question would be "confusing[.]"

### *Opening Statements*

The State told the jury that it would call two witnesses. One witness, Ms. Alexander, would testify that K.J.'s cell phone use on July 12, 2019 led to a phone call with Ms. Jordan. During this call, Ms. Jordan yelled at Ms. Alexander and threatened to come to the program.

3

Sometime later, Ms. Jordan arrived at the program and interrupted a parent conference. Ms. Jordan then "tr[ied] to swing at" Ms. Alexander. Ms. Jordan also hit Mr. Harried, who sustained several blows and injuries when he attempted to separate Ms. Jordan and Ms. Alexander.

In her opening statement, defense counsel did not dispute the State's contention that an altercation occurred between Ms. Jordan and Ms. Alexander, with Mr. Harried caught in the middle. Rather, defense counsel maintained that Ms. Alexander was the aggressor, not Ms. Jordan. Defense counsel told the jury that Ms. Jordan was K.J.'s aunt, that Ms. Jordan had raised K.J. since she was nine years old, that Ms. Jordan was K.J.'s legal guardian and referred to her niece as her daughter, and that she never gave Ms. Alexander permission to take K.J.'s cell phone.

Further, defense counsel told the jury that on July 12, 2019, Ms. Alexander took K.J.'s phone without permission and called K.J. a mute and a liar. Upset, K.J. called Ms. Jordan. During this call, Ms. Jordan heard a loud voice in the background. Ms. Alexander then took the phone from K.J. and proceeded to yell and curse at Ms. Jordan. Ms. Jordan later arrived at the program to check on K.J., and when she found Ms. Alexander, Ms. Alexander initiated the altercation.

*Ms. Alexander's Testimony*

The State called Ms. Alexander to testify first. According to Ms. Alexander, she discovered K.J. on her phone in class and asked her to put it in her purse. Several hours later, Ms. Alexander saw K.J. on her phone again, and confronted her about it. K.J. began

4

"crying and screaming," which prompted Ms. Alexander to call K.J.'s grandmother, who didn't answer.

K.J. then called her aunt, Ms. Jordan. Ms. Alexander asked K.J. for the phone so she could speak with Ms. Jordan. Their conversation lasted "less than 30 seconds[,]" and ended when Ms. Alexander hung up the phone because Ms. Jordan was screaming and "cussing [her] out left and right."

Later that day, Ms. Alexander and Mr. Harried were meeting with another student's parents. Ms. Jordan entered the conference room "with force" and asked to speak with "that B who [she] was talking to on the phone." Ms. Alexander told Ms. Jordan that she was in a meeting and asked her to leave. Instead of leaving, Ms. Jordan lunged at and hit Ms. Alexander, catching her by surprise. Ms. Jordan and Ms. Alexander called each other "a bitch." Mr. Harried tried to separate the two and "blocked" Ms. Alexander from hitting Ms. Jordan.

While Mr. Harried was blocking Ms. Alexander, Ms. Jordan hit him several times. Ms. Alexander told Mr. Harried "to move out [of] the way [and] don't stand there." Mr. Harried asked for someone to call the police. Ms. Jordan then picked up a wet floor sign and attempted to hit both Ms. Alexander and Mr. Harried with it. Shortly thereafter, another person took the sign from Ms. Jordan and asked her to leave the building, which she did.

In addition, in response to questions posed by the State in anticipation of the defense's version of events, Ms. Alexander denied kicking off her shoes at any point,

5

denied that Ms. Jordan's conduct was warranted, denied that anyone ever hit Ms. Jordan, and claimed to be following protocol during this incident.

On cross-examination, Ms. Alexander denied that she had left K.J.'s grandmother a voicemail in which she impugned K.J.'s intelligence and called her a "mute." Ms. Alexander admitted that she accused K.J. of lying about putting the phone away. She acknowledged she could not hear what K.J. was telling Ms. Jordan on the phone but told the police that K.J. must have told Ms. Jordan "inflammatory things" that prompted Ms. Jordan to start the fight. Ms. Alexander disputed defense counsel's contention that Ms. Alexander told K.J. that she would not amount to anything in life.

Defense counsel also questioned Ms. Alexander about her telephone conversation with Ms. Jordan. Ms. Alexander denied telling Ms. Jordan that she "had time today[,]" that she told Ms. Jordan to "pull up[,]" or that she gave Ms. Jordan the address of the facility. As to the physical altercation, Ms. Alexander denied that Ms. Jordan calmly entered the room or that she (Ms. Alexander) "hopped up and began cursing at" Ms. Jordan. Ms. Alexander admitted to picking up a fire extinguisher and pointing its hose at Ms. Jordan, but stated that she did so to "defend" herself after Ms. Jordan picked up the wet floor sign.

On redirect, Ms. Alexander stated that she did not incite Ms. Jordan and that neither she nor Mr. Harried hit Ms. Jordan.

*Mr. Harried's Testimony*

Mr. Harried recounted a similar version of events. During the parent conference, Ms. Jordan "came in and [] busted open the door and said, where is the bitch that hung up

6

the phone on me when I was cussing her . . . a-s-s out." At this point, he immediately went to the door to separate Ms. Alexander and Ms. Jordan. While blocking the door, he was hit several times by Ms. Jordan and asked for someone to call the police. He saw Ms. Jordan pick up the wet floor sign but noted that Ms. Jordan was only in the process of swinging the sign before she was stopped by another person. Mr. Harried maintained that he never hit Ms. Jordan or called her or K.J. any names. Mr. Harried's glasses were damaged during the altercation, which cost $5.00 to get fixed. He also went to the hospital for injuries sustained to his knee. He received a hospital bill totaling $711.51.

Mr. Harried testified on cross-examination that he observed Ms. Alexander talking to K.J. about her phone use in the hallway. However, he did not see K.J. crying. He saw Ms. Alexander on the phone with Ms. Jordan. Although he did not know what they were saying, he testified that Ms. Alexander's voice was not raised.

Mr. Harried was also cross-examined about the events that occurred after Ms. Jordan arrived. According to Mr. Harried, when Ms. Jordan came into the classroom, Ms. Alexander remained seated near the parents and did not kick her shoes off. Rather, Ms. Jordan "bust[ed]" the door open and kicked her shoes off. When he saw this, he immediately "ran to the door" to inform her they were "in the middle of a parent conference." When at the door, Ms. Alexander was behind him and he was facing Ms. Jordan. Mr. Harried did not see Ms. Alexander pick up the fire extinguisher.

On redirect, Mr. Harried stated that when police arrived, Ms. Jordan told him that she "got something for you. You was smiling." He also reemphasized that it was Ms. Jordan, not Ms. Alexander, who kicked off her shoes.

7

After Mr. Harried finished testifying, the State rested and the court denied defense counsel's motion for judgment of acquittal.

*K.J.'s Testimony*

The defense called K.J. to testify first. K.J. testified that during a CPR class, without explanation, Ms. Alexander came in and put K.J.'s phone case and purse on the other side of the room. After class, K.J. spoke with Ms. Alexander about her cell phone usage. K.J. told Ms. Alexander that her cell phone was currently in her back pocket and was never in her purse as Ms. Alexander had thought. Ms. Alexander then raised her voice and called K.J. "a liar [who] . . . was[] never going to be nothing in life if [she] ke[pt] lying. . . ." This caused K.J. to cry.

Ms. Alexander then called K.J.'s grandmother, who did not answer. Still crying, K.J. called Ms. Jordan to tell her what was happening. During the call, "Ms. [Alexander] was yelling . . . in the background . . . . [T]hen Ms. [Alexander] took [the] phone out [of her] hand and started yelling at [Ms. Jordan]." Although K.J. was unable to hear what Ms. Jordan was saying to Ms. Alexander, she heard Ms. Alexander tell Ms. Jordan "to pull up" and gave Ms. Jordan the program's address. K.J. then went outside to wait for Ms. Jordan. When Ms. Jordan arrived, they went inside to collect K.J.'s things, after which Ms. Jordan went to find Ms. Alexander.

When Ms. Jordan found Ms. Alexander, she opened the door and asked "where is the lady[] that I was talking to on the phone[?]" Ms. Alexander responded by "hopp[ing] up and [taking] her shoes off and started trying to fight [Ms. Jordan]." During this time,

8

K.J. was between Mr. Harried and Ms. Jordan. K.J. observed Ms. Jordan "[w]alking back and forth saying stuff[,]" but could not recall exactly what she said.

K.J. did not see Ms. Jordan hit Ms. Alexander or Mr. Harried; however, she did see Ms. Jordan "[p]ick up a wet floor sign[,]" but didn't see her do anything with it. After Ms. Jordan picked up the sign, K.J. saw Ms. Alexander pick up a fire extinguisher and try to hit Ms. Jordan with it. Ms. Jordan went outside and then the police arrived.

On cross-examination, K.J. admitted that she was testifying at Ms. Jordan's request, that she and Ms. Jordan rode to court together, and that she didn't want her aunt to go to jail. There was no redirect.

*Ms. Jordan's Testimony*

After K.J.'s testimony, defense counsel advised Ms. Jordan of her right not to testify and told her that the court would instruct the jury "that they would not even be able to consider it, let alone think about it, in determining if the State has met their burden" of proving her guilt beyond a reasonable doubt. Ms. Jordan chose to waive her Fifth Amendment right against self-incrimination and proceeded to take the stand.

Ms. Jordan explained that even though K.J. was her niece, she referred to her as one of her four children. Ms. Jordan had custody of K.J. since she was nine years old and took care of her between the ages of two and five. On the morning of July 12, she was struggling to braid a client's hair due to limited movement in her right hand caused by sickle cell anemia. Later that day, K.J. called her crying. Ms. Jordan could hear Ms. Alexander "in the background screaming." Ms. Alexander then took the phone and told Ms. Jordan to

9

"pull up. . . . I will drag you today." Ms. Alexander also gave Ms. Jordan the address of the program.

Ms. Jordan came to the program "to see what was wrong with [K.J.]." When she arrived, she saw K.J. outside. They went inside to gather K.J.'s things and, thereafter, Ms. Jordan searched for Ms. Alexander. Ms. Jordan found Ms. Alexander in a conference room and entered the room. Ms. Jordan was in the process of introducing herself when Ms. Alexander suddenly "was like, it's me bitch. What's up. [Ms. Alexander] [k]icked her shoes off [to] try to fight [Ms. Jordan]." Ms. Alexander "threw something at [Ms. Jordan] first[,]" which prompted Mr. Harried to get in between them. Ms. Alexander picked up a fire extinguisher and "was trying to hit [Ms. Jordan] with it." In response, Ms. Jordan "picked up the wet floor sign . . . ." Ms. Jordan, however, was never able to swing the sign because a man in a purple shirt asked her to exit the building and she obliged. Once outside, Ms. Jordan called campus security. She denied ever hitting either Mr. Harried or Ms. Alexander.

Ms. Jordan concluded her testimony emphasizing that she was K.J.'s guardian and that she never gave Ms. Alexander permission to take her cell phone.

On cross-examination, the State called into question Ms. Jordan's parenting. Specifically, the State pointed out that Ms. Jordan "didn't know where [K.J.] was working[,]" yet was "responsible for" her. The State also confirmed that although Ms. Jordan claimed to be K.J.'s legal guardian, she did not bring any documentation to prove it. There was no redirect.

10

*The State's Closing Argument*

The State's closing argument focused on the credibility of the State's witnesses as compared to the defense witnesses. The State downplayed K.J.'s testimony, arguing that she only recalled that her phone was taken, that Ms. Jordan picked up a wet floor sign, and that Ms. Alexander picked up the fire extinguisher. The State argued that K.J. did not "remember any of the details that were described by Ms. Alexander as well as Mr. Harried." Moreover, the State argued that K.J. was not even present when the altercation occurred.

The State also attacked Ms. Jordan's credibility. The State questioned her alleged side business of braiding hair despite battling sickle cell anemia. The State also called into question Ms. Jordan's parenting of K.J. and asserted that Ms. Jordan picked a fight because Ms. Alexander did not recognize her as K.J.'s guardian.

The State argued that the testimony from Ms. Jordan and K.J. was not as detailed as the State's witnesses. The State commented on the demeanor of both Ms. Jordan and K.J., describing their body language as "very stiff[,]" an indication of defensiveness.

The State encouraged the jury to rely on Ms. Alexander's and Mr. Harried's testimony because they were teachers and had no reason to be dishonest. The State argued that they both presented detailed testimony, corroborated each other's statements, and were merely trying to help youngsters acquire life skills.

*Defense Counsel's Closing Argument*

Defense counsel reminded the jury that Ms. Jordan was to be presumed innocent and that the State bore the burden of proof. As such, it was unfair of the State to suggest that it was incumbent on Ms. Jordan to bring to court proof of her guardianship over K.J.

11

Defense counsel further argued that Ms. Jordan's parenting skills are irrelevant and that the State raised the issue to distract the jury.

Defense counsel contended that both Ms. Alexander and Mr. Harried were engaged in a "cover up" and a "clean up" to salvage the program, which was jeopardized by the incident. Defense counsel argued that Ms. Alexander was not forthcoming in her testimony, reminding the jury that it was only on cross-examination that she admitted to calling K.J. a liar and being frustrated with her.

Defense counsel argued that Ms. Jordan gave very candid testimony; that Ms. Jordan came to the program because her niece was distraught; that Ms. Jordan acknowledged picking up the wet floor sign and explained she did so because Ms. Alexander picked up the fire extinguisher; and that Ms. Jordan candidly described her medical condition, which made it difficult to close her hand. Defense counsel argued that the State wanted the jury to believe that a woman with that disability "came there months after having another [health] crisis in March and came there to fight these two people."

*The Verdict*

The jury convicted Ms. Jordan of assaulting Mr. Harried but found her not guilty of assaulting Ms. Alexander. The court sentenced Ms. Jordan to two years of prison, with all but 10 days suspended, plus two years of supervised probation.

*Appeal to Court of Special Appeals*

Ms. Jordan appealed her conviction. In a per curiam opinion, the Court of Special Appeals determined that the trial court erred under *Kazadi*, that the issue was preserved and not waived, and that the error was not harmless. *Jordan v. State*, No. 2594, 2021 WL

12

1311194, at *1-2 (Md. Ct. Spec. App. Apr. 8, 2021). The Court reversed the judgment and remanded the case for a new trial. *Id.* at *1.

## DISCUSSION

The State contends that the error was a trial error subject to a harmless error analysis. The State argues that because Ms. Jordan testified, the error was harmless beyond a reasonable doubt. The State views the jury's split decision as evidence that Ms. Jordan's decision to testify helped her cause.

Ms. Jordan counters that the failure to ask the *Kazadi* question constitutes structural error because it implicates a defendant's fundamental rights. Further, even if the harmless error doctrine did apply, Ms. Jordan argues that the error was not harmless. As Ms. Jordan sees it, the failure to ask the question resulted in unquantifiable harm from the moment the jury was impaneled, thereby rendering her subsequent testimony irrelevant to the harmless error analysis.

The question before us is whether the specific *Kazadi* error in this case—the failure to ask the voir dire question concerning the right not to testify—was harmless. Our analysis will proceed in the following sequence. *First*, we will outline the salient points from *Kazadi*. *Second*, we will explain why the *Kazadi* error committed here is subject to the harmless error doctrine.[3] And *third*, having determined that such error is subject to

---

[3] It should be noted that we are not addressing in this opinion whether the failure to ask the venire about their willingness and ability to comply with the court's instructions on the presumption of innocence and the State's burden of proof—that is, the other two *Kazadi* questions—are structural errors. The State has not asked us to provide such an expansive holding, and we do not have the benefit of briefing on such issues.

13

harmless error review, we will explain why, under the facts of this case, the error was harmless.

### *Kazadi v. State*

From at least 1964, trial judges were not required to ask the prospective jurors whether they would comply with jury instructions on the presumption of innocence and burden of proof. *Twining v. State*, 234 Md. 97, 100 (1964). In fact, we characterized such questions as "inappropriate." *Id.* We decided *Twining* in an era when jury instructions were merely advisory. *Id.*; *Kazadi*, 467 Md. at 24. So, there was no point in asking prospective jurors whether they'd comply with an instruction with which they were under no obligation to comply.

The advisory nature of jury instructions, or, more precisely, of *some* jury instructions, gave way over the ensuing seventeen years after we decided *Twining*. In 1980, in *Stevenson v. State*, this Court pared back the jury's role as the "judges of law" to judges of "the law of the crime, or the definition of the crime, as well as the legal effect of the evidence before the jury." 289 Md. 167, 177-78 (1980) (cleaned up), *overruled by Unger v. State*, 427 Md. 383 (2012). This left "all other legal issues . . . for the [trial court] alone to decide." *Id.* at 179. Shortly after deciding *Stevenson*, we decided *Montgomery v. State*, where we held that a trial court may not instruct a jury that it "could pay no attention to instructions" regarding the presumption of innocence, burden of proof, and the right to not testify. 292 Md. 84, 91 (1981), *overruled by Unger v. State*, 427 Md. 383 (2012).

Fast forward to 2020, when this Court decided *Kazadi v. State*. In *Kazadi*, this Court recognized that the erosion of the jury's right to disregard the court's instructions on

14

fundamental rights came with a concomitant need to allow defendants to identify prospective jurors who lacked either the willingness or ability to comply with such instructions. 467 Md. at 46. This observation derives from the notion that a court's instruction on the defendant's fundamental rights after the jury is chosen would "be too little, and too late to uncover the basis for disqualification[]" of those jurors unwilling or unable to follow such instructions. *Id*. at 39. Thus, we held that,

> on request, during *voir dire*, a trial court must ask whether any prospective jurors are unwilling or unable to comply with the jury instructions on the fundamental principles of presumption of innocence, the State's burden of proof, and the defendant's right not to testify.[4]

*Id.* at 9.

Notably, we did not hold that a trial by a fair and impartial jury was impossible without asking such questions; such questions were required only if requested, and the court was under no obligation to ask them *sua sponte*. *Id*. at 46-47. Our holding was grounded on the more modest premise that such a question "undoubtedly helps to safeguard a defendant's right to be tried by a fair and impartial jury." *Id*. at 41. And we kept intact Maryland's longstanding policy that "*voir dire*'s sole purpose is to elicit specific cause for disqualification, not to aid counsel in the intelligent use of peremptory strikes." *Id*. at 46 (quoting *Collins v. State*, 463 Md. 372, 404 (2019)).

---

[4] There is, of course, much more to the rationale for the Court's decision in *Kazadi* to overturn *Twining* than what is covered here. Nothing in this opinion should, therefore, be construed as changing either the holding in *Kazadi* or the Court's reasoning behind the same.

15

The issue of harmless error was not before us in *Kazadi*. But it has now been placed squarely before us. The threshold inquiry is whether the harmless error doctrine applies to the *Kazadi* error here. It is to this issue that we now turn.

### Structural v. Trial Errors

### A

The harmless error doctrine is grounded in the notion that a defendant has the right to a fair trial, but not a perfect one. *Dorsey v. State*, 276 Md. 638, 647 (1976) (quoting *State v. Babb*, 258 Md. 547, 552 (1970)). So, errors that do not contribute to a defendant's guilty verdict do not warrant reversal. *See id.* at 653. Once error is established, the State must convince an appellate court, beyond a reasonable doubt, "that the error in no way influenced the verdict[.]" *Id*. at 659; *see also Chapman v. California*, 386 U.S. 18, 24 (1967).

But not all errors must run through the harmless error gauntlet; only "an error in the trial process itself[]" does. *Weaver v. Massachusetts*, ____ U.S. ___, 137 S. Ct. 1899, 1907 (2017) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)); *Ramirez v. State*, 464 Md. 532, 539 n.1 (2019). Such trial errors may include violations of both constitutional rights and rights derived from elsewhere. *See Chapman*, 386 U.S. at 22; *see also Arizona*, 499 U.S. at 306-07.

The United States Supreme Court has found trial errors in a variety of instances. Such errors include a jury instruction containing an improper presumption, *Carella v. California*, 491 U.S. 263, 266 (1989); a prosecutor's comment on a defendant's silence at trial in violation of a defendant's Fifth Amendment right, *United States v. Hasting*, 461

16

U.S. 499, 500, 512 (1983); barring a party's cross-examination of a witness for bias in violation of the Confrontation Clause of the Sixth Amendment, *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); and failing to instruct the jury on the defendant's presumption of innocence, *Kentucky v. Whorton*, 441 U.S. 786, 789-90 (1979).

Likewise, this Court has found trial errors in various contexts, including giving an anti-CSI effect jury instruction, *Taylor v. State*, 473 Md. 205, 235 (2021); requiring a defendant to decide whether he would testify prior to the testimony of the last defense witness, *Stoddard v. State*, 423 Md. 420, 438 (2011); deciding incorrectly that the defendant waived the attorney-client privilege, *Greenberg v. State*, 421 Md. 396, 413-14 (2011); and failing to ascertain a co-defendant's basis for invoking his Fifth Amendment right against self-incrimination when an improper plea deal was involved, *Bhagwat v. State*, 338 Md. 263, 279-80, 282 (1995).

Although the harmless error doctrine casts a wide net, there are certain types of errors that elude its application because of their "unquantifiable and indeterminate[]" effect on the framework of trial. *Sullivan v. Louisiana*, 508 U.S. 275, 281-82 (1993). Such errors are known as structural errors, which have been described as "defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Arizona*, 499 U.S. at 309; *see also Redman v. State*, 363 Md. 298, 303 n.5 (2001).

The Supreme Court identified three "broad categories" of structural errors. *First*, an error may be structural "if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest[]" such as the "right to conduct [one's] own defense[.]" *Weaver*, 137 S. Ct. at 1908. *Second*, an error may be

17

structural if its effect is not susceptible to measurement, such as the denial of the right to counsel of one's choosing. *Id.* And *third*, errors that "always result[] in fundamental unfairness[]" have been deemed structural, such as the failure to give a reasonable doubt instruction. *Id.*

The Supreme Court has found structural errors in relatively few cases, including a complete denial of counsel, *Gideon v. Wainwright*, 372 U.S. 335, 343-45 (1963); a judge who lacks impartiality, *Tumey v. Ohio*, 273 U.S. 510, 535 (1927); the exclusion of individuals from a grand jury because of race, *Vasquez v. Hillery*, 474 U.S. 254, 263-64 (1986); and interference with a defendant's right of self-representation at trial, *McKaskle v. Wiggins*, 465 U.S. 168, 187-88 (1984).

Similarly, this Court has found structural errors in a limited number of situations, including "giving [an] advisory only jury instruction[,]" *State v. Waine*, 444 Md. 692, 705 (2015); giving a flawed reasonable doubt jury instruction, *Savoy v. State*, 420 Md. 232, 254 (2011); violating a defendant's right to a public trial, *Robinson v. State*, 410 Md. 91, 109-10 (2009); and failing to swear-in a jury, *Harris v. State*, 406 Md. 115, 130-31 (2008).

**B**

Ms. Jordan argues that the trial court's failure to propound the *Kazadi* question amounts to structural error because (1) it ensures the jury is unbiased, which is akin to the swearing-in of a jury; and (2) unlike other types of voir dire questions, fundamental rights are implicated. The State counters that the failure to ask the question required under *Kazadi* should be considered trial error because such failure does not fit into any of the structural error categories outlined by the Supreme Court in *Weaver*.

18

For guidance, certain cases are instructive. In *Sullivan v. Louisiana*, the issue was whether a constitutionally deficient reasonable doubt instruction always requires a reversal or may be subject to a harmless error analysis.[5] 508 U.S. at 276. There, the Court explained that the Sixth Amendment entitles a defendant to a trial by an impartial jury, and the Fifth Amendment imposes a "proof beyond a reasonable doubt" standard on the government. *Id*. at 278. Construed together, "the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt." *Id*. Thus, if the jury receives a defective instruction on reasonable doubt, the defendant is deprived of the jury trial guaranteed by the Sixth Amendment. *Id*. at 277-78.

In *Sullivan*, the Court set up its analysis of structural versus trial error by observing that under *Chapman*, the harmless error inquiry "is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." *Id*. at 279. The Court in *Sullivan* explained that the erroneous reasonable doubt instruction was not susceptible to harmless error review because the defective instruction deprived the jury of the means to render a guilty "verdict within the meaning of the Sixth Amendment[.]" *Id*. at 280. Without such a verdict, "[t]here is no object, so to speak, upon which harmless-error scrutiny can operate." *Id*. (emphasis omitted). Thus, the *Chapman* inquiry of "whether the *same* verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless." *Id.*

---

[5] As this Court has previously noted, "not all errors in a reasonable doubt instruction are of constitutional magnitude." *Savoy*, 420 Md. at 238.

19

The case of *United States v. Hasting* is also instructive. 461 U.S. 499 (1983). There, in closing argument, the prosecutor improperly commented on the defendants' decision not to testify. *Id.* at 502. The Court concluded that a harmless error analysis was possible through a careful evaluation of the trial record. *Id.* at 509-10. After examining the evidence adduced by the State, the Court concluded that "a more compelling case of guilt [was] difficult to imagine." *Id*. at 511. In contrast, after examining the defense's evidence, the Court concluded that the defense advanced "patently and totally inconsistent theories [that] could hardly have escaped the attention of the jurors." *Id.* at 512. Thus, the Court concluded the error was a harmless trial error. *Id.*

In *Ramirez v. State*, this Court addressed an ineffective assistance of counsel claim in the context of a post-conviction proceeding.[6] 464 Md. at 539. During voir dire, a prospective juror admitted to an inability to be fair and impartial due to a recent burglary of his home. *Id.* at 539-40. Yet, defense counsel failed to move to strike that juror for cause, and that juror was impaneled. *Id.* at 540.

On appeal from the denial of his post-conviction petition, the defendant argued that his counsel rendered ineffective assistance by allowing a biased juror to be seated, which amounted to structural error. *Id.* at 541. We concluded that defense counsel's representation was deficient for failing to move to strike the juror. *Id.* at 566-67. But we also observed that "[n]ot every claim with respect to the failure to strike or challenge an

---

[6] *Ramirez* addressed the interplay between structural errors and the prejudice element of an ineffective assistance of counsel claim. 464 Md. at 538-39. Because the elements of an ineffective assistance of counsel claim are not relevant here, we will confine our discussion of *Ramirez* to the structural error analysis.

allegedly biased juror will result in a determination that a trial was fundamentally unfair." *Id.* at 573. In other words, the seating of a biased juror is not necessarily a structural error.

In *Ramirez*, we also held that even if the error was structural, the defendant would not have been relieved of his burden to prove that defense counsel's error was prejudicial in a post-conviction claim of ineffective assistance of counsel. *Id.* And although the prejudice analysis is different than the harmless error analysis, we find it instructive that, in *Ramirez*, we were able to evaluate the strength of the State's case to determine whether the inclusion on the jury of an allegedly biased juror prejudiced the defendant. *See id.* at 578. We recognized that the State produced substantial evidence of the defendant's guilt. *Id.* at 580. Such evidence included testimony from the victims, the getaway driver, and physical evidence corroborating the witnesses' testimony. *Id.* at 579-80. Thus, we found no significant possibility that the jury would have reached a different verdict without the allegedly biased juror. *Id.* at 580.

There are two Maryland cases worth discussing that involve the failure to swear-in the jury as required under common law and Article 5 of the Maryland Declaration of Rights. In *Harris v. State*, we held that the complete failure to swear-in a jury constituted structural error because "the administration of the oath is an essential ingredient of a legally constituted . . . and . . . impartial jury." 406 Md. at 124, 129. Thus, the defendant was not "adjudged guilty by any authorized trier of fact[,]" rendering the verdict a "nullity." *Id.* at 129. In addition, we noted that the error was structural because jeopardy does not attach if the jury that rendered the verdict was not sworn in. *Id.* at 131-32.

21

In contrast, in *Alston v. State*, the court did not realize until the fourth day of trial, after the State had rested, that the jury had not been sworn. 414 Md. 92, 98 (2010). At that point, the court proceeded to swear-in the jury and questioned the jurors to ensure their ability to abide by the oath. *Id.* at 99. We determined that, in contrast to *Harris*, the belatedly sworn jury allowed jeopardy to attach and, in conjunction with the court's questioning of the jurors, alleviated the concerns about impartiality. *Id.* at 105-06. Indeed, the jury's acquittal of the defendant on various charges indicated that the jurors diligently and impartially considered each count. *Id.* at 109. Thus, the error was deemed to be a harmless trial error as opposed to a structural error. *Id.* at 107.

Our assessment of the caselaw brings us to the conclusion that the error here falls on the trial error side of the ledger. There is no claim that the jury was not properly instructed on matters pertaining to Ms. Jordan's fundamental constitutional rights, or that the jury was never sworn. Thus, unlike *Sullivan*, where the jury received a deficient reasonable doubt instruction, and unlike *Harris*, where the jury was never sworn, the jury verdict here was not inherently infirm from a constitutional standpoint. In other words, unlike in *Sullivan*, here there *was* an "object, so to speak, upon which harmless-error scrutiny can operate." 508 U.S. at 280 (emphasis omitted).

The error committed here can readily be assessed for its impact or influence on the jury verdict. In that regard, this case aligns with *Ramirez v. State*. In *Ramirez*, the defendant's Sixth Amendment right to an impartial jury was at stake. 464 Md. at 567. Similarly here, Ms. Jordan's Fifth Amendment right against self-incrimination was at stake. In *Ramirez*, the error was the seating of a juror identified in the voir dire process as

22

someone who should have been stricken for cause. *Id.* at 559-60. Here, the error was depriving the defendant of a tool for identifying individuals who should be struck for cause. We *know* that in *Ramirez*, a juror who have been stricken for cause made it on to the jury; *id.* at 540, here we can only speculate that someone who should have been stricken for cause was seated on the jury. In *Ramirez*, we determined that the actual seating of a biased juror did not automatically render the trial fundamentally unfair, and therefore we could not say that the error was structural. *Id.* at 573. Thus, here, we determine that the *possibility* that an individual was empaneled who should have stricken for cause did not render Ms. Jordan's trial fundamentally unfair.

This case also favorably compares to *Hasting*, where the Supreme Court found harmless error in the prosecution's improper comments on the defendant's silence at trial. 461 U.S. at 512. The danger in such an error was that one or more jurors could have been persuaded by the prosecution to infer guilt from the defendant's failure to testify. That is akin to the risk presented by the failure to ask the *Kazadi* question about the right to remain silent—namely, that an individual who would view the defendant's failure to testify as evidence of guilt would make it on to the jury. As in *Hasting*, we too conclude that the error here was a trial error subject to the harmless error doctrine.

## C

Now we must determine whether the State has demonstrated beyond a reasonable doubt that the refusal to ask the *Kazadi* question did not contribute to the guilty verdict. The court's refusal to ask the question deprived Ms. Jordan of a tool for identifying individuals who should have been stricken for cause for their unwillingness or inability to

23

comply with the court's instruction on the defendant's right to remain silent. We perceive two ways in which a refusal of this nature could conceivably contribute to a guilty verdict. First, a possible consequence of not asking the *Kazadi* question is that a juror who is unwilling or unable to comply with the right to silence instruction could have been empaneled on the jury. Second, the refusal could have been the deciding factor in the defendant's decision to testify.

We can summarily rule out the first possibility because Ms. Jordan testified. The trial court never gave the jury instruction concerning a defendant's right not to testify. Thus, none of the jurors had an opportunity to disregard such an instruction.

The second scenario is theoretically possible here. Testifying can be risky for some defendants for a variety of different reasons. For example, if a defendant knows that he will be impeached with a prior conviction if he testifies, but is more concerned the jury would see his failure to testify as evidence of guilt, it's possible the defendant will choose to testify when he otherwise would have chosen not to. In that case, the refusal to ask the *Kazadi* question could conceivably contribute to the guilty verdict. Thus, we must examine the evidentiary record to determine if that possibility was realized in this instance.

At trial, the central issue was whether Ms. Jordan was the aggressor as alleged by the State, or whether Ms. Alexander was the aggressor as argued by the defense. It was a classic credibility contest. Ms. Jordan neither disputed that she had an altercation with Ms. Alexander, nor that Mr. Harried got caught in the middle of the two. That these facts were not disputed was evident in defense counsel's opening statement, cross-examination of Ms.

24

Alexander and Mr. Harried, direct examination of K.J. and Ms. Jordan, and closing argument.

Two witnesses testified for the State: Ms. Alexander and Mr. Harried. Ms. Alexander explained in detail her interactions with both K.J. and Ms. Jordan. Ms. Alexander portrayed Ms. Jordan as the aggressor, and Mr. Harried corroborated Ms. Alexander's statement. Thus, when the State rested, the jury had more than enough credible, unrebutted testimony to convict Ms. Jordan on both counts of assault. And the jury had heard only Ms. Alexander's side of the story.

As a practical matter, therefore, Ms. Jordan was all but required to put on a defense. Although K.J. testified in her defense, it is not surprising that Ms. Jordan decided that the jury should hear her side of the story directly from herself.

Having examined closely Ms. Jordan's trial testimony, we are convinced beyond a reasonable doubt that her testimony did not contribute to the guilty verdict on the charge of assaulting Mr. Harried. Defense counsel's direct examination of Ms. Jordan was focused and concise. Much of her testimony established her status as K.J.'s guardian and refuted Ms. Alexander's testimony. Ms. Jordan did not just deny Ms. Alexander's account, she painted Ms. Alexander as the aggressor, spoiling for a fight.

In contrast, very little of Ms. Jordan's testimony touched upon the specific allegation that she hit Mr. Harried. Such testimony consumed, by our estimate, less than three percent of Ms. Jordan's direct testimony, consisting of the following exchange:

Q: Mr. Milroy?

25

A:     Mr. Milroy, yeah.  He was in the middle of both of us.  She had the fire extinguisher.  She was trying to hit me with it.  She was swinging it like this.  So when she was swinging it, I picked up the wet floor sign because you not about to hit me with a fire extinguisher.

Q:     []Ms. Jordan, you said that [Mr. Harried] was in between you.  Where were you standing at, ma'am?

A:     I was in the hallway and he was in directly between the doors like this (indicating).

Q:     And . . . at any point in time, Ms. Jordan, did you swing at Ms. Alexander[?]

A:     No.  I didn't swing at neither one of them.  And I told the police that.

That last answer—in response to a question that didn't even include Mr. Harried—was the only denial the jury heard from Ms. Jordan that she hit Mr. Harried.

On cross, the State sought only to undermine Ms. Jordan's credibility, not to affirmatively support the assault charges.  The State asked questions designed to sow doubt about Ms. Jordan's claimed status as K.J.'s legal guardian and to paint Ms. Jordan as a neglectful guardian.  But the State did not catch Ms. Jordan in any lies; in fact, the State did not even try to do so.  Nor did the State ask Ms. Jordan a single question about her version of the incident.

It is likely that Ms. Jordan's testimony had a positive effect on the jury, as evidenced by the jury's acquittal of her on the charge of assaulting Ms. Alexander.  But to find harmless error, we need not engage in such speculation—we need only determine beyond a reasonable doubt that her testimony did not contribute to the guilty verdict on the charge of assaulting Mr. Harried.  We have no such difficulty here.  As shown above, Ms. Jordan's testimony was limited to denying the allegation that she struck Mr. Harried.  And although

26

her denial clearly did not provide the jury with reasonable doubt that she struck Mr. Harried, her testimony provided no evidence that she did assault him. At worst, therefore, the jury declined to credit her denial of hitting Mr. Harried, which is a far cry from providing evidence tending to establish her guilt. *See Fuentes v. State*, 454 Md. 296, 320 (2017) ("While denial of scienter may permit a finding of scienter, [the defendant's] denial that he made a statement . . . does not, alone, permit an evidentiary finding that he, in fact, made this statement."); *see also Grimm v. State*, 447 Md. 482, 510 (2016) (quoting *Carter v. State*, 10 Md. App. 50, 54 (1970) ("The defendant may, if he wishes, testify in his defense. If he does so, ordinarily, disbelieving his testimony is not the same as finding positive evidence to the contrary . . . .")); *see also Att'y Grievance Comm'n v. Clements*, 319 Md. 289, 298 (1990) ("A refusal to believe evidence of a respondent, however, does not, of itself, supply affirmative evidence of the dishonesty, fraud, deceit or misrepresentation charged."). Accordingly, we find that the *Kazadi* error here was harmless.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. COSTS TO BE PAID BY RESPONDENT.**

27

Circuit Court for Baltimore City
Case No. 819290001
Argued: December 6, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 23

September Term, 2021

_____

STATE OF MARYLAND

v.

LATOYA JORDAN

_____

*Getty, C.J.
*McDonald
Watts
Hotten
Booth
Biran
Gould,


JJ.

_____

Dissenting Opinion by Watts, J., which Biran, J., joins.

_____

Filed: August 15, 2022

*Getty, C.J., and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court. After being recalled pursuant to Maryland Constitution, Article IV, Section 3A, they also participated in the decision and adoption of this opinion.

Respectfully, I dissent.  I would affirm the judgment of the Court of Special Appeals and conclude that the Circuit Court for Baltimore City's failure to ask a mandatory upon request *voir dire* question about a constitutional right constituted reversible error, *i.e.*, not harmless error.  I would hold that a trial court's failure to propound the *voir dire* question at issue—namely, a question concerning prospective jurors' willingness or ability to follow an instruction concerning a defendant's right not to testify—results in reversible error regardless of whether the defendant testifies at trial.

In Kazadi v. State, 467 Md. 1, 35-36, 223 A.3d 554, 574-75 (2020), this Court held that, "on request, during *voir dire*, a trial court must ask whether prospective jurors are unwilling or unable to comply with jury instructions on the long-standing fundamental principles of the presumption of innocence, the State's burden of proof, and the defendant's right not to testify."  We overruled Twining v. State, 234 Md. 97, 100, 198 A.2d 291, 293 (1964), an almost sixty-year-old case, which held that it was not an abuse of discretion for a circuit court to decline to ask during *voir dire* about a prospective juror's ability to follow instructions on "presumption of innocence and the burden of proof[,]" because, since the decision in Twining, jury instructions had become binding on the jury as opposed to advisory.  Kazadi, 467 Md. at 24, 36, 223 A.3d at 568, 575 (citations omitted).  We explained that the rights at issue in Kazadi—the presumption of innocence, the burden of proof, and the right not to testify—"have existed for more than two centuries[,]" and "are critical to a fair jury trial in a criminal case[.]"  Id. at 44-45, 223 A.3d at 580-81.

With respect to the right not to testify, we stated that "[t]he Fifth Amendment to the Constitution of the United States, which was ratified in 1791, expressly enshrines the right

not to testify, stating in relevant part: 'No person shall be . . . compelled in any criminal case to be a witness against him[- or her]self[.]'" Id. at 45, 223 A.3d at 580 (last two alterations in original). We noted that "[a]lthough the Constitution does not explicitly refer to the burden of proof or the presumption of innocence, both of those principles existed under the common law at least since around the time of the country's founding." Id. at 45, 223 A.3d at 580 (citations omitted). We concluded that with respect to all three of the rights at issue—the two fundamental rights and the constitutional right not to testify—the criteria forth in Collins v. State, 463 Md. 372, 376-77, 205 A.3d 1012, 1014 (2019)[1] for when a circuit court is required to ask a *voir dire* question upon request were satisfied. Kazadi, 467 Md. at 44-45, 223 A.3d at 580.

In this case, Ms. Jordan indisputably requested a *voir dire* question involving a prospective juror's ability to follow an instruction concerning the defendant's constitutional right not to testify—one of the Kazadi questions.[2] I see no reason to depart

---

[1]In Kazadi, 467 Md. at 44-45, 223 A.3d at 580, we stated:

In Collins, 463 Md. at 376-77, 205 A.3d at 1014, we explained the criteria as follows: On request, a trial court must ask a *voir dire* question if and only if the *voir dire* question is reasonably likely to reveal specific cause for disqualification. There are two categories of specific cause for disqualification: (1) a statute disqualifies a prospective juror; or (2) a collateral matter is reasonably liable to have undue influence over a prospective juror. The latter category is comprised of biases that are directly related to the crime, the witnesses, or the defendant.

(Paragraph break and brackets omitted).
[2]The State acknowledges that it did not argue below that Kazadi should not apply to Ms. Jordan given the timing of her appeal. In any case, this Court recently clarified that "Kazadi applies to any case pending in a trial or appellate court that had not become final

from our holding in <u>Kazadi</u>—that upon request a trial court must ask whether prospective jurors are unwilling or unable to comply with a jury instruction on the defendant's right not to testify—where the defendant testifies at trial. In <u>Kazadi</u>, we provided no qualification with respect to the application of our holding. In other words, in <u>Kazadi</u>, we did not conclude that the *voir dire* question concerning a juror's ability or willingness to follow an instruction on the defendant's right not to testify is mandatory upon request only where the defendant does not testify. Indeed, in most instances, it would not be possible for the trial court to know whether a defendant will ultimately testify at the point that *voir dire* questions are asked of prospective jurors. It is clear that the *voir dire* question concerning a defendant's right not to testify is required to be asked, *i.e.*, mandatory, upon

_____

on direct appeal when the opinion was issued," or stated otherwise, to "cases in which there had not yet been a final disposition at the time that the opinion was issued, and in which the issue was preserved for appellate review." <u>Kumar v. State</u>, 477 Md. 45, 68, 266 A.3d 295, 309 (2021).

To the extent that there is a question about whether new interpretations of the law should be promulgated by referral to the Standing Committee on Rules of Practice and Procedure (the Rules Committee), rather than by case law, in <u>Kazadi</u>, where the new holding concerned an issue of constitutional significance in criminal law, this Court followed the well-established precedent of reversing a judgment of the circuit court or the Court of Special Appeals and giving application of the new holding to all pending cases in which there had not yet been a final disposition.

Indeed, after <u>Kazadi</u>, in <u>Rochkind v. Stevenson</u>, 471 Md. 1, 38, 236 A.3d 630, 652 (2020), <u>reconsideration denied</u> (Sept. 25, 2020), a civil case, this Court adopted the <u>Daubert</u> standard in Maryland, "a new interpretation of Rule 5-702," and made the holding applicable to the case and any other cases that were pending on appeal when the opinion in <u>Rochkind</u> was filed, "where the relevant question has been preserved for appellate review." In refusing to implement the new evidentiary standard by rulemaking, this Court stated that it "is well suited to weigh the advantages and disadvantages of modifying our approach to any area of the law—as we often do. That this change implicates our interpretation of the Maryland Rules does not necessitate a referral to the Rules Committee." <u>Id.</u> at 29 n.15, 236 A.3d at 646 n.15.

request in a criminal case, regardless of whether a defendant later decides to testify.    In other words, the question is not whether under <u>Kazadi</u> a trial court's failure to ask a *voir dire* question concerning a juror's ability to follow an instruction on the defendant's constitutional right not to testify is error—it is.   Rather, the question is whether the error constitutes reversible error.   I would conclude that it does.

In a criminal trial, one of the most difficult decisions that defense counsel makes is how to advise a client concerning whether to testify and one of the decisions left solely to the discretion of the defendant, albeit with the advice of counsel, is whether to testify. Some jurors take it as evidence of guilt if a defendant elects not to testify.  <u>See, e.g.,</u> Mitchell J. Frank & Dr. Dawn Broschard, *The Silent Criminal Defendant and the Presumption of Innocence: In the Hands of Real Jurors, Is Either of Them Safe?*, 10 Lewis & Clark L. Rev. 237, 264-65 (2006).  It goes without saying that where a defendant decides to testify, the defendant's testimony is critical to the outcome of the case.  A trial court not asking upon request, in keeping with the Court's holding in <u>Kazadi</u>, a *voir dire* question to ascertain whether prospective jurors would be able to follow an instruction that the defendant has a constitutional right to remain silent or is not required to testify cannot be deemed harmless.  A defendant who testifies has a constitutional right not to and it is critical when a defendant testifies that jurors understand that the defendant was not required or mandated to do so.  In the absence of a *voir dire* question being asked upon request concerning the right, it cannot be ruled out that a defendant will feel compelled to testify as the trial court will have refused the defendant an opportunity to assess whether jurors would equate silence with guilt and the defendant who testifies will be forced to face the

scrutiny of jurors who may believe that the defendant was compelled or had no choice but to testify.

The purpose of the question at issue is not solely to uncover a prospective juror's ability to follow an instruction by the trial court but rather the intent of the question— indeed of all three of the Kazadi questions—is to uncover a prospective juror's regard for the important fundamental principles and constitutional right at stake. The circumstance that an instruction as to the defendant's right not to testify is not given where a defendant testifies does not eliminate the need for the inquiry. No reasonable person would argue that a juror who disclosed during *voir dire* that the juror did not believe that the defendant had a right not to testify, or held the view that the defendant should be compelled to testify, should not be subject to disqualification. See Md. Code Ann., Cts. & Jud. Proc. (1974, 2020 Repl. Vol.) § 8-404(b)(2). In other words, a juror who disclosed during *voir dire* that the juror did not believe that a defendant had a constitutional right not to testify would not be deemed qualified to serve as a juror if the juror could be assured that the defendant would indeed testify.

Our decision to grant the petition for a writ of *certiorari*, vacate the judgment, and remand in Soule illustrates the point that the Kazadi *voir dire* questions serve a purpose broader than literally uncovering whether prospective jurors are able to follow jury instructions. See Soule v. State, 467 Md. 689, 226 A.3d 234 (2020); Soule v. State, 467 Md. 432, 225 A.3d 415 (2020). In Soule, the defendant filed a petition for a writ of *certiorari* raising two questions, including one as to whether this Court should revisit its case law concluding that it was inappropriate for a trial court to ask *voir dire* questions

concerning the presumption of innocence. Specifically, Soule raised the following question: "Should this Court revisit its cases holding it inappropriate to question venirepersons regarding the presumption of innocence, given the widespread use of such questions throughout the State?" The question did not ask whether the Court should revisit the issue of questioning jurors as to their unwillingness or inability to follow a jury instruction on the presumption of innocence. This Court placed the petition on hold pending the disposition of Kazadi.

After issuance of the opinion in Kazadi, on March 2, 2020, this Court issued an order granting the petition for a writ of *certiorari* in Soule and an order vacating the judgment of the Court of Special Appeals and remanding the case to that Court to consider whether the holding in Kazadi should be applied in the case and, if so, to reconsider its prior opinion. See Soule, 467 Md. 689, 226 A.3d 234; Soule, 467 Md. 432, 225 A.3d 415. Only a few weeks later, on March 20, 2020, in an unreported opinion, the Court of Special Appeals determined that Kazadi applied to Soule and reconsidered the issue of whether the trial court abused its discretion in denying Soule's requested *voir dire* questions. See Joseph Patrick Soule v. State of Maryland, No. 903, Sept. Term, 2017, 2020 WL 1330201, *1 (Md. Ct. Spec. App. Mar. 20, 2020). The Court of Special Appeals observed that Soule had asked the trial court "to inquire about the weight jurors would assign to [his] testimony, their ability to maintain a presumption of innocence, and their understanding of the reasonable doubt standard[,]" and that in refusing the request, the trial court had stated that jury instructions would cover those issues and that the law "regarding the State's burden would be addressed in the jury instruction exactly as required pursuant to the holding of

*Twining*[.]" Id. at \*2. The Court of Special Appeals concluded that, in light of this Court's holding in Kazadi, the trial court's reliance on Twining was misplaced and that the court was required to ask upon request the proposed *voir dire* questions concerning the jurors' understanding of the defendant's fundamental rights. See id.

Apart from the significance of the constitutional right not to testify and the need to ascertain a prospective juror's ability to understand the right, this Court has consistently held that a circuit court's failure to propound a mandatory upon request *voir dire* question is not harmless error. See Moore v. State, 412 Md. 635, 668, 989 A.2d 1150, 1168 (2010); Bowie v. State, 324 Md. 1, 11, 595 A.2d 448, 453 (1991); Langley v. State, 281 Md. 337, 348-49, 378 A.2d 1338, 1344 (1977). In Langley, 281 Md. at 349, 378 A.2d at 1344, we held that "where a principal part of the State's evidence [was] testimony of a police officer diametrically opposed to that of a defendant, it [was] prejudicial error to fail to propound" upon request a question asking whether jurors would give more credence to a witness merely because of the witness's status as a law enforcement officer.

In Bowie, 324 Md. at 11, 595 A.2d at 453, this Court relied on Langley in determining that the trial court erred in refusing to propound upon request questions asking whether jurors would believe the testimony of law enforcement witnesses more than that other witnesses or whether any juror would accord less credence to defense witnesses, and held that the error in refusing to ask such questions was not harmless. In so holding, we rejected the State's contention that Langley applies only when a defendant testifies and gives testimony that is "diametrically opposed" to the testimony of law enforcement witnesses. Bowie, 324 Md. at 9-10, 595 A.2d at 452. We observed that, because the State

has the burden of proof in a criminal case, credibility of the State's witnesses is relevant even in the absence of conflicting narratives and regardless of whether the defendant testifies. See id. at 10, 595 A.2d at 452. As such, we concluded that the trial court's refusal to ask *voir dire* questions concerning whether jurors would give more weight to the testimony of law enforcement officers than to other witnesses was reversible error. See id. at 10-11, 595 A.2d at 452-53.

In Moore, 412 Md. at 641-42, 989 A.2d at 1153, the trial court refused to ask *voir dire* questions aimed at discerning whether potential jurors would be biased against witnesses because the witnesses were witnesses for the defense. Applying the holdings in Bowie and Langley, we concluded that a juror who would assign less credibility to a defense witness simply because of the witness's affiliation with the defense "may be prejudiced" and it was therefore an abuse of discretion to deny the requested *vior dire* question where the question was "directed" at this potential bias. Id. at 654, 989 A.2d at 1160. We stated that "[t]he purpose of *voir dire* is to ensure and secure a defendant's right to a fair and impartial trial by permitting the selection of a jury comprised of venirepersons who do not hold preconceived notions or biases that would affect the outcome of the trial." Id. at 664, 989 A.2d at 1166. Relying on Bowie, 324 Md. at 10, 595 A.2d at 452, we reiterated that a defendant has a right to "determine whether witnesses called by the State will start with a presumption of credibility simply because of the positions occupied rather than the facts of the case." Moore, 412 Md. at 665, 989 A.2d at 1167 (cleaned up). We held that the failure to ask the defense-witness *voir dire* question was reversible error and not harmless. See id. at 668, 989 A.2d at 1168.

There is no basis on which to distinguish the above precedent on reversible error where, as in this case, a trial court has failed to ask upon request a *voir dire* question concerning jurors' ability to follow an instruction on the defendant's constitutional right not to testify and the defendant testifies at trial. The question is aimed at uncovering bias against the defendant. In this case, the question—whether any juror would be unable to "abide" by the rule of law that a defendant possesses a constitutional right not to testify—addresses not only whether a juror would hold a decision not to testify against the defendant but also whether a proposed juror holds the view that a defendant is required to testify or must testify to establish innocence. A juror who believes that a decision not to testify should be held against a defendant, *i.e.*, a defendant is required to testify or compelled to testify to establish innocence, would be as biased against a defendant who elects to testify as the juror would be against a defendant who elected not to testify. In Kazadi, 467 Md. at 45, 223 A.3d at 580, we explained:

> On request, a trial court must ask *voir dire* questions that are reasonably likely to reveal a cause for disqualification involving matters that are liable to have undue influence over a prospective juror. Such matters may be comprised of biases related to the crime or the defendant. Certainly, the belief that a defendant must testify or prove innocence, or an unwillingness or inability to comply with jury instructions on the presumption of innocence, burden of proof, or a defendant's right not to testify, otherwise would constitute a bias related to the defendant. As a matter of fact, it is difficult to conceive of circumstances that could be more prejudicial to a defendant's right to a fair trial.

The principle that the failure to ask, upon request, a *voir dire* question concerning a defendant's right not to testify constitutes reversible error applies with equal force whether the defendant testifies or not because the question relates to the concern that a juror might

be biased against a defendant by holding a failure to testify against the defendant or discounting a defendant's testimony because the juror believes that the defendant had no right to remain silent or not to testify.

In that regard, the *voir dire* question at issue is similar to the questions at issue in Moore, Bowie, and Langley, cases in which this Court concluded the trial court's failure to ask upon request constituted reversible error. If there is any distinction at all between the cases, it is that unlike in Moore, Bowie, and Langley, where the *voir dire* questions addressed specific witnesses who may or may not have testified at a given trial, the question at issue in this case concerned a defendant's absolute constitutional right not to testify at a criminal trial. This Court has already held that the failure to ask the Kazadi *voir dire* questions upon request is reversible error. See State v. Ablonczy, 474 Md. 149, 153-54, 166, 253 A.3d 598, 600-01, 607-08 (2021) (holding that a defendant did not waive an objection to a trial court's failure to ask upon request a *voir dire* question containing all three Kazadi questions and affirming the Court of Special Appeals's reversal of the trial court's judgment.). I would not depart from our precedent on reversible error established in Kazadi and Ablonczy where the failure to ask upon request a mandatory *voir dire* question concerning the constitutional right not to testify is concerned.

Separate and distinct from the holding in Kazadi making the question at issue mandatory upon request and the holdings in Moore, Bowie, and Langley making the failure to ask upon request *voir dire* questions concerning bias against a defendant reversible error, the error in this case was plainly not harmless. In this case, Ms. Jordan's credibility as a witness was of paramount importance considering the diametrically opposed testimony of

- 10 -

other witnesses presented at trial.  In <u>Dorsey v. State</u>, 276 Md. 638, 659, 350 A.2d 665, 678 (1976), this Court explained the harmless error standard as follows:

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of-whether erroneously admitted or excluded-may have contributed to the rendition of the guilty verdict.[3]

Ms. Jordan was convicted of assault.  The State's theory of the case was that Ms. Jordan was the aggressor in an altercation involving Mary Alexander, a person who ran a youth program that Ms. Jordan's niece attended.  At trial, as witnesses for the State, Ms. Alexander and another person, Milroy Harried, testified that after yelling at Ms. Alexander on the telephone, Ms. Jordan burst into a meeting with Ms. Alexander and Mr. Harried, kicked off her shoes, and hit both of them.

Ms. Jordan and her niece testified that the opposite had occurred.  Ms. Jordan testified that it was actually Ms. Alexander who yelled at and threatened her on the phone, and that Ms. Alexander removed her shoes and attempted to hit her with a fire

---

[3]In <u>Newton v. State</u>, 455 Md. 341, 353, 168 A.3d 1, 8 (2017), this Court explained that the United States Supreme Court "has acknowledged that certain constitutional rights are so basic to a fair trial that their infraction can never be treated as harmless error.  These errors are known as structural errors because they affect the framework within which the trial proceeds and are not simply an error in the trial process itself." (Cleaned up).  Thus, "[i]f a structural error is objected to at trial and raised on direct appeal, the defendant is entitled to automatic reversal regardless of the error's actual effect on the outcome." <u>Id.</u> at 353, 168 A.3d at 8 (cleaned up).  Although a strong argument can be made that a trial court's failure to ask upon request a *voir dire* question concerning a juror's ability to follow an instruction on the defendant's right not to testify is structural error, because I would conclude that the failure to propound the mandatory *voir dire* question upon request cannot be harmless, from my perspective, there is no need to address the issue of structural error.

extinguisher—in essence, Ms. Jordan testified that she was the victim. Ms. Jordan's niece's testimony was basically the same.[4] As a result of this conflicting testimony, credibility was essential in the jury's fact-finding process. If a juror were unwilling or unable to accept the court's instruction as to a defendant having a constitutional right not to testify, undoubtedly, the juror may have viewed Ms. Jordan's testimony as less than credible, or at a minimum, with suspicion. On this basis alone, it cannot be determined that the failure to ask the requested *voir dire* question did not influence the verdict.[5]

The State's theory that the circuit court's refusal to propound the requested question was harmless because, according to the State, the verdict showed that Ms. Jordan's testimony helped and did not harm the defense as the jury returned a partial acquittal, is speculative at best and based on flawed reasoning. Consistent with the State's logic, if Ms.

---

[4]On cross-examination, though, Ms. Jordan's niece acknowledged that she did not want her aunt to go to jail and that they had travelled together to court.

[5]In the past, this Court has declined to find harmless error in circumstances in which the error did not implicate a constitutionally protected right but involved an issue concerning the defendant's credibility. For instance, in Howard v. State, 324 Md. 505, 515, 517, 597 A.2d 964, 969, 970 (1991), where the trial court erred in admitting evidence of the defendant's prior conviction of an offense that was the same as the charged offense, this Court held that the error was not harmless because the case essentially involved a credibility determination between the defendant and a witness for the State. We stated: "In a case that largely turned on whom the jury was going to believe, the improperly admitted evidence of the defendant's prior conviction may have been the weight which caused the jurors to accept one version rather than the other." Id. at 517, 597 A.2d at 970. In Martin v. State, 364 Md. 692, 695, 775 A.2d 385, 386-87 (2001), where a Baltimore City police officer was charged with criminal offenses and the trial court prohibited cross-examination of a State's witness as to action taken in contemplation of a civil lawsuit against the city, this Court held that the denial of cross-examination regarding the witness's intent to bring a civil action was reversible error and not harmless. We explained that the defendant was denied the opportunity to establish bias on the part of the witness and was denied the opportunity to impeach the witness's credibility. See id. at 703, 775 A.2d at 391.

Jordan's testimony swayed the jury in part, the possibility that a juror viewed her testimony with bias or heightened suspicion, due to the belief that as a defendant she was required to testify, may have precluded an acquittal on all charges.

The conclusion that Ms. Jordan's decision to testify cured any error with respect to the circuit court's refusal to ask the *voir dire* question concerning her constitutional right not to testify is based on faulty logic. To be sure, where a defendant elects to testify, the contemplated instruction would not be given. But, as explained above, a juror's acknowledged unwillingness or inability to follow an instruction concerning a defendant's right not to testify means that the juror may believe that a defendant is testifying because the defendant is required to do so or is obliged to prove innocence. There is no requirement that a defendant show actual prejudice to avoid a determination of harmless error.[6] See Perez v. State, 420 Md. 57, 60, 75-76, 21 A.3d 1048, 1050, 1059 (2011) (holding that the Court of Special Appeals applied a weakened harmless error standard when it determined that a failure to notify defense counsel of jury notes was harmless error because Perez failed to show prejudice).

The harmless error standard establishes a demanding burden for the State to meet. See Dionas v. State, 436 Md. 97, 109, 80 A.3d 1058, 1065 (2013). Harmless error will not be found where there is a reasonable possibility that the error influenced the verdict. See

---

[6]In contrast, under Strickland v. Washington, 466 U.S. 668 (1984), to establish the second prong of an ineffective assistance of counsel claim, a petitioner must demonstrate that trial counsel's performance resulted in actual prejudice and that but for the errors at issue there would have been a reasonable probability of a different result. See Ramirez v. State, 464 Md. 532, 561, 212 A.3d 363, 380 (2019).

id. at 121, 80 A.3d at 1072. In this case, Ms. Jordan testified at trial after the circuit court refused to ask a mandatory *voir dire* question upon request to determine whether prospective jurors would be unwilling or unable to follow the court's instruction that she had the right not to testify. I would conclude that, under this Court's holding in <u>Kazadi</u> and our case law on reversible error concerning the failure to ask mandatory upon request *voir dire* questions, the question concerning Ms. Jordan's constitutional right not to testify was required to be asked and there was more than a reasonable possibility that the failure to ask the question affected the verdict.

For the above reasons, respectfully, I dissent.

Judge Biran has authorized me to state that he joins in this opinion.

Circuit Court for Baltimore City
Case No. 819290001
Argued: December 6, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 23

September Term, 2021

_____

STATE OF MARYLAND

v.

LATOYA JORDAN

_____

\*Getty, C.J.
\*McDonald
Watts
Hotten
Booth
Biran
Gould,

JJ.

_____

Dissenting Opinion by Biran, J.,
which Watts, J., joins.

_____

Filed: August 15, 2022

\*Getty, C.J., and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court. After being recalled pursuant to Maryland Constitution, Article IV, Section 3A, they also participated in the decision and adoption of the majority opinion.

Respectfully, I dissent. In my view, two paths lead to affirmance of the Court of Special Appeals' judgment in this case. The first is the one that Judge Watts has laid out persuasively in her dissenting opinion, which I am pleased to join. As Judge Watts explains, the State cannot meet its burden to show that the trial court's failure to ask the *Kazadi* question concerning the right not to testify is harmless. I write separately to discuss the other rationale for affirmance. I would hold that: (1) a trial court must ask all three of the *Kazadi* questions whether or not they are requested by the defendant; and (2) a trial court's failure to ask any one of the *Kazadi* questions constitutes a structural error subject to automatic reversal. Because the trial court in this case failed to ask the *Kazadi* question concerning the defendant's right not to testify, a structural error occurred that mandates reversal and a new trial.

In 1964, the Court of Appeals decided *Twining v. State*, in which "this Court held that a trial court need not ask during *voir dire* whether any prospective jurors would be unwilling to follow jury instructions on the presumption of innocence and the State's burden of proof." *Kazadi v. State*, 467 Md. 1, 7 (2020) (citing *Twining v. State*, 234 Md. 97, 100 (1964)). The Court's holding in *Twining* was based, in part, on the fact that "[t]he rules of law stated in the proposed questions were fully and fairly covered in subsequent instructions to the jury" and that "[i]t is generally recognized that it is inappropriate to instruct on the law at this stage of the case, or to question the jury as to whether or not they would be disposed to follow or apply stated rules of law." *Twining v. State*, 234 Md. 97, 100 (1964). The Court found that this conclusion "would seem to be particularly true in Maryland, where the courts' instructions are only advisory." *Id.*

*Twining* remained the controlling law on *voir dire* questions in Maryland for over half a century. However, in 2020, the Court once again revisited the issue of *voir dire* questions concerning the presumption of innocence, the burden of proof, and the defendant's right not to testify. In *Kazadi*, the Court "determine[d] that this Court's holding as to *voir dire* questions concerning jury instructions in *Twining* ... is based on outdated reasoning and has been superseded by significant changes in the law." 467 Md. at 35. As such, the Court decided to "overrule the holding in *Twining*, and conclude that, on request, during *voir dire*, a trial court must ask whether any prospective jurors are unwilling or unable to comply with the jury instructions on the long-standing fundamental principles of the presumption of innocence, the State's burden of proof, and the defendant's right not to testify." *Id*. at 35-36.

In reaching its holding in *Kazadi*, the Court noted that asking jurors *voir dire* questions concerning these three fundamental rights "undoubtedly helps to safeguard a defendant's right to be tried by a fair and impartial jury" as "responses indicating an inability or unwillingness to follow jury instructions give rise to grounds for disqualification—i.e., a basis for meritorious motions to strike for cause the responding prospective jurors, that may not be discovered until it is too late, or may not be discovered at all." *Id*. at 41-42 (citations omitted). The Court highlighted that "in the decades since this Court decided *Twining*, it has become apparent that not all jurors are willing and able to follow jury instructions on the presumption of innocence and the burden of proof." *Id*. at 36-37. The Court concluded that simply giving jury instructions on these rights is "not an effective remedy for a prospective juror who is unwilling or unable to follow such jury

instructions" as "[j]ury instructions cannot bring a prospective juror's inability to understand, or adversity toward, fundamental rights to the attention of the trial court and the parties—only *voir dire* questions can." *Id*. at 38-39. "Simply put, if a trial court seats a prospective juror who is unwilling or unable to follow jury instructions on the presumption of innocence and the burden of proof, jury instructions, which are given at the end of trial will be too little, and too late to uncover the basis for disqualification." *Id*. at 39. The Court concluded:

> On request, a trial court must ask *voir dire* questions that are reasonably likely to reveal a cause for disqualification involving matters that are liable to have undue influence over a prospective juror. Such matters may be comprised of biases related to the crime or the defendant. Certainly, the belief that a defendant must testify or prove innocence, or an unwillingness or inability to comply with jury instructions on the presumption of innocence, burden of proof, or a defendant's right not to testify, otherwise would constitute a bias related to the defendant. As a matter of fact, it is difficult to conceive of circumstances that could be more prejudicial to a defendant's right to a fair trial.

*Id*. at 45.

In the Court's view, "[b]y making such *voir dire* questions mandatory on request, we help ensure that a juror's inability or unwillingness to follow instructions involving these three important fundamental rights will be discovered before trial, and that all defendants—not just ones whose trials are presided over by circuit court judges who chose to exercise the discretion to grant requests to ask such *voir dire* questions—will have the opportunity to move to strike prospective jurors for cause on the ground of an unwillingness or inability to adhere to these fundamental rights." *Id*. at 46.

However, despite the language quoted above explaining the importance of these fundamental principles and the role they play in ensuring a defendant's right to a fair and impartial jury, we stated "that a trial court is not required, on its own initiative, to ask *voir dire* questions concerning fundamental rights. Instead, a trial court must ask such *voir dire* questions only if a defendant requests them." *Id*. at 47. The Court reasoned that this was "consistent with prior cases in which this Court has required trial courts to grant requests to ask certain *voir dire* questions, as opposed to requiring trial courts to ask those *voir dire* questions *sua sponte*." *Id*. (citing *Washington v. State*, 425 Md. 306, 315 (2012) and *Pearson v. State*, 437 Md. 350, 354 (2014)).

In my view, it is time for us to hold that the three *Kazadi* questions are mandatory in all criminal jury trials, whether or not defense counsel requests them. Given that the requirement that a trial court ask these questions upon request is meant to help "safeguard a defendant's right to be tried by a fair and impartial jury" and that "it is difficult to conceive of circumstances that could be more prejudicial to a defendant's right to a fair trial" than allowing someone who would not respect these fundamental rights onto a jury, *Kazadi*, 467 Md. at 41, 45, it is not clear why it should be defense counsel's job to ensure that this safeguard is deployed. If the giving of subsequent jury instructions on these fundamental rights is inadequate to cure the error of failing to ask the *Kazadi* questions during *voir dire*, it seems peculiar that an attorney's failure to request that they be asked would not necessarily be deemed an error in the first place. A holding that explicitly makes the *Kazadi* questions mandatory would extend *Kazadi*'s rationale to its logical conclusion.

In any event, post-*Kazadi*, the three questions already are effectively mandatory because every competent defense attorney will request that the trial court put these questions to the potential jurors. After *Kazadi,* I cannot imagine any circumstance in which a defense attorney who fails to request that the court ask all three questions would not provide constitutionally deficient representation under the "performance prong" of the test for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See, e.g.*, *Newton v. State*, 455 Md. 341, 355 (2017) (discussing *Strickland*'s performance prong).

Once we accept that giving the three *Kazadi* questions must be mandatory regardless of a defense request, it becomes clear that the failure to ask any of the three questions is a structural error requiring automatic reversal. As the Majority notes, the Supreme Court has identified three "broad categories" of structural errors that are not subject to harmless error review. *See* Majority Slip Op. at 17; *see also Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017). First, an error may be structural if the right at issue is not designed to protect the defendant from erroneous conviction, but rather protects another interest. Second, an error may be structural if its effect cannot be measured. Third, an error that always results in fundamental unfairness is structural.

At a minimum, the second and third of these rationales support a finding of structural error when the trial court fails to ask one or more of the *Kazadi* questions. As applied to this case, it is impossible to gauge the effect of the trial court's failure to ask the potential jurors if they would follow a jury instruction concerning the defendant's right not to testify. As Judge Watts points out in her dissenting opinion, "[i]f a juror were unwilling

or unable to accept the court's instruction as to a defendant having a constitutional right not to testify, undoubtedly, the juror may have viewed Ms. Jordan's testimony as less than credible, or at a minimum, with suspicion." Dissenting Slip Op. at 12 (Watts, J., dissenting). We do not know, nor can we possibly know, if any such jurors were part of Ms. Jordan's jury. Thus, separate and apart from any aspect of the evidentiary presentation at trial, there is no way to determine whether the failure to ask the *voir dire* question concerning the defendant's right not to testify contributed to the guilty verdict.

Moreover, a holding of structural error in these circumstances is aligned with the Court's statement in *Kazadi* that "if a trial court seats a prospective juror who is unwilling or unable to follow jury instructions on the presumption of innocence and the burden of proof, jury instructions, which are given at the end of trial will be too little, and too late to uncover the basis for disqualification." 467 Md. at 39. If jury instructions cannot cure the failure to ask these fundamental *voir dire* questions because the composition of the jury has already been established at that point, the same is true of a defendant's subsequent decision to testify. The right not to testify is the most tangible of the *Kazadi* rights and helps illuminate the other two. If a juror believes that a defendant must testify, by definition, they cannot faithfully apply the presumption of innocence or hold the State to its burden of proof.

In *Harris v. State*, this Court determined that "a jury which has never been sworn falls into the same 'structural error' category as a defective reasonable doubt instruction, the denial of a right to a jury trial, the total deprivation of counsel, discrimination in the selection of juries, etc." 406 Md. 115, 130 (2008). In reaching this conclusion, we noted

that there is "no basis to distinguish between a judge who is not impartial and a jury which is not impartial. And, as the cases in other states all hold, an unsworn jury deprives the defendant of the constitutional right to an impartial jury." *Id*. at 130-31.

Under *Harris*, a *Kazadi*-compliant jury must be sworn or else the trial will be infected with a structural error. That being the case, it is difficult to understand how empaneling a sworn, but non-*Kazadi*-compliant jury – a jury that may contain one or two or more jurors who are unable to respect a defendant's fundamental rights – does not also give rise to structural error. If the failure to make the jurors promise that they will decide the case impartially is a structural error, so too is the failure to ensure that only people who can be impartial become the jurors who make that promise.

For these reasons, I would hold that a trial court is always required to ask the questions outlined in *Kazadi* during *voir dire*, regardless of whether they are requested by the defendant, and that a trial court's failure to ask such questions constitutes a structural error subject to automatic reversal.

Judge Watts has authorized me to state that she joins this opinion.